[Civ. No. 3026. Third Appellate District.—June 14, 1926.]

## H. HIROSHIMA, Respondent, v. BANK OF ITALY (a Corporation), Appellant.

[1] BANKS AND BANKING—CHECKS—STOPPING PAYMENT—FAILURE TO OBSERVE ORDER—DAMAGES—PLEADING.—In an action against a bank for negligently paying the amount of a check upon which payment had been ordered stopped, where the complaint alleges the amount of money plaintiff had on deposit (which amount was in excess of the amount of the check), the issuance of the check by plaintiff, the giving of the stop-notice by plaintiff to defendant and the failure of defendant to observe the same, a demand for the money, and a statement that it has not been paid, and the prayer of the complaint is for the recovery of the money, it is not necessary for plaintiff to further allege that he was damaged by the act complained of, or in what manner he was damaged in the premises.

[2] ID.—WRONGFUL PAYMENT OF MONEY—MEASURE OF DAMAGES.— Where the payment of a certain sum of money is alleged to have been wrongfully made, the amount of damages suffered necessarily appears from a statement of the facts thus set forth.

[3] ID.—DEBTOR AND CREDITOR—ORDER OF DEPOSITOR—HOLDER IN DUE COURSE—CONSIDERATION.—While the relation between a bank and

---

1. See 8 Cal. Jur. 882.
3. See 4 Cal. Jur. 187, 188.

a depositor is that of creditor and debtor, yet for the purpose of paying a check the bank is subject to the orders of the depositor in relation to the payment of said check, even as against a holder in due course, and irrespective of whether there was or was not any consideration moving between the maker and the payee for the issuance of said check.

[4] ID.—CHECK—WHEN AN ASSIGNMENT.—A check is a direction by a creditor to a debtor for the disposition of funds, and it does not operate as an assignment of the funds themselves unless and until the bank accepts or certifies the check.

[5] ID.—ISSUANCE OF CHECK—REVOCATION OF ORDER.—As a general rule the drawer of an uncertified check can revoke his order for the payment of his funds, or in banking phraseology "stop payment," at any time before the bank's acceptance of the check, and the bank is bound by such revocation and has no right to pay the check after notice thereof.

[6] ID.—STOPPING PAYMENT—LIABILITY TO HOLDER.—Stopping payment of a check does not discharge the liability of the maker to the holder, but the holder must look to the maker for his remedy.

[7] ID.—WAIVER OF LIABILITY—MISTAKE OF FACT—PUBLIC POLICY— DISREGARD OF NOTICE.—In an action against a bank for negligently paying the amount of a check upon which payment had been ordered stopped, the defendant is not entitled to judgment based upon its special defense that the stop-notice given by plaintiff recited that "the undersigned makes the foregoing request as an act of courtesy only, and hereby indemnifies you against, and releases you from all liability by reason of compliance or noncompliance therewith," where the trial court finds that plaintiff's assent and signature to the stop-notice were given under the influence of mistake and misapprehension and unconscious ignorance of the fact that said instrument contained a provision relieving defendant of liability in the event that it failed to stop payment of the check, and the trial court also finds as a fact and also draws the conclusion of law that said provision is against public policy and void, that there was no consideration moving from defendant to plaintiff for the execution of said writing, and that defendant, contrary to the notification and instruction of plaintiff, heedlessly, negligently, and carelessly and without exercising ordinary or reasonable care, paid the check upon which the stop-notice was given.

4.  See 4 Cal. Jur. 244; 5 R. C. L. 489.
5.  See 5 R. C. L. 526.
6.  See 19 Cal. Jur. 953.

[8] ID.—MISTAKE OF FACT—EVIDENCE.—In such action, the testimony showing the condition under which the stop-notice was signed, the fact that plaintiff was unable to read the English language, the fact that the stop-notice was not read to plaintiff and that he was told that if he wanted payment on the check stopped "he must sign" the paper presented to him by defendant, brings the case within the provisions of section 1577 of the Civil Code defining mistake of fact.

[9] ID.—ORAL STOP-NOTICE—EFFECT OF SUBSEQUENT WRITING.—The law does not require a stop-notice to be in writing; and the verbal or oral notice given by plaintiff to defendant prior to the signing of defendant's special form of stop-notice was sufficient to require defendant to observe such direction, and the writing only aided in identifying the check upon which the stop-notice was given.

[10] ID.—PUBLIC POLICY—ILLEGAL AGREEMENT—INTENT.—Public policy is that principle of law which holds that no person can lawfully do that which has a tendency to be injurious to the public or against the public good, which may be designated the policy of the law or public policy in relation to the administration of the law; and if an agreement binds the parties or either of them to do, or if the consideration is to do, something opposed to public policy of the state or nation it is illegal and absolutely void, however solemnly made and even though the intent of the parties was good.

[11] ID.—DUTY TO COMPLY WITH DIRECTIONS—COURTESY OF BANK.—Compliance by a bank with a direction to stop payment of a check is not in law merely an act of courtesy, but it is a bounden duty of the bank to use all reasonable efforts to comply with the directions so given.

[12] ID.—DUTY TO COMPLY WITH NOTICE—WAIVER OF LIABILITY—PUBLIC POLICY.—Upon receipt of a verbal notice by a depositor to stop payment, it becomes the legal duty of the bank to comply therewith; and where the bank thereupon induces the depositor to sign a written form of stop-notice which purports to eliminate all the provisions of section 1668 of the Civil Code and leaves the bank free to follow the directions of the stop-notice or not at its pleasure, such writing is against public policy.

[13] ID.—LEGAL LIABILITY—LIQUIDATED DAMAGES—VOID CONTRACT.—Where a bank wrongfully, and in disregard of a stop-notice, pays out the money of a depositor, the amount of damage is readily

10.    See 6 Cal. Jur. 109.

13.    See 6 Cal. Jur. 116; 3 R. C. L. 340; 6 R. C. L. 427.

ascertainable, and, under the provisions of section 1670 of the Civil Code, if an attempt is made to limit the liability of the bank by fixing a definite sum of money, such provision is void.

---

(1) 7 C. J., p. 667, n. 99.    (2) 17 C. J., p. 999, n. 47 New.    (3) 7 C. J., p. 642, n. 2, p. 669, n. 38, p. 701, n. 52.    (4) 5 C. J., p. 921, n. 63; 7 C. J., p. 698, n. 45.    (5) 7 C. J., p. 701, n. 52.    (6) 5 C. J., p. 921, n. 63; 7 C. J., p. 669, n. 38, p. 702, n. 53; 8 C. J., p. 64, n. 5. (7) 7 C. J., p. 701, n. 52; 13 C. J., p. 374, n. 53, 54.    (8) 7 C. J., p. 669, n. 39.    (9) 7 C. J., p. 701, n. 52.    (10) 13 C. J., p. 424, n. 19, p. 425, n. 20, 21, 22, p. 429, n. 52.    (11) 13 C. J., p. 351, n. 27.    (12) 13 C. J., p. 429, n. 53.    (13) 13 C. J., p. 420, n. 77, p. 426, n. 36, p. 427, n. 43, p. 491, n. 98, 99, 2.

APPEAL from a judgment of the Superior Court of Sacramento County. Peter J. Shields, Judge. Affirmed.

The facts are stated in the opinion of the court.

McLaughlin & McLaughlin, Louis Ferrari and J. J. Posner, for Appellant.

Henry & Bedeau for Respondent.

PLUMMER, J.—Plaintiff had judgment in an action against the defendant for negligently paying the amount of a check upon which payment had been ordered stopped, from which judgment the defendant appeals.

Omitting the formal part, the complaint contains the following allegations:

"That the plaintiff on the 18th day of November, 1924, had on deposit in said bank operated and conducted in said City of Sacramento by the defendant the sum of $823.31, or thereabouts.

"On said 18th day of November, 1924, plaintiff drew a check against said account on deposit in said defendant's bank in favor of one M. Yamakita in the sum of $436.50; said check being post-dated November 27, 1924. After the drawing and delivery of said check to said M. Yamakita, and before the same was presented to and paid by the defendant, to-wit: on November 20, 1924, the plaintiff notified and instructed defendant not to pay said check when pre-

sented, and to stop payment on the same, which the defendant then and there agreed to do.

"That the defendant, contrary to said agreement hereinabove set forth, negligently and carelessly, on the 29th day of November, 1924, paid said check in full upon the same being presented by one S. Fujita, sometimes known as S. Yamakita, to whom said check had been endorsed by said M. Yamakita, as plaintiff is informed and believes. That after the payment of said check said defendant deducted and withdrew from the account of this plaintiff said sum of $436.50, and debited his account with that sum.

"That plaintiff has demanded of the defendant, on numerous occasions prior to the filing of this complaint, the payment and return to him of said sum of $436.50, but the said defendant refused and still refuses to do so.

"That by reason of the foregoing there is now due, owing and unpaid from defendant to plaintiff the sum of $436.50.

"Wherefore, plaintiff prays judgment against defendant for the sum of $436.50; for interest on said sum as is allowed by law; for his costs of suit herein expended, and for such other, further and different relief as to the Court may seem just."

To this complaint the defendant demurred, setting forth several grounds, of which the following only are urged on appeal: That said complaint does not state facts sufficient to constitute a cause of action; that the complaint ·is uncertain in that it does not appear, nor can it be ascertained therefrom whether Yamakita was or was not a holder in due course; whether ·or not plaintiff had been damaged by the payment of the check; whether or not plaintiff received full value as a consideration for his delivery of said check to the payee, Yamakita. The defendant's demurrer being overruled, the answer was filed pleading the stop-notice *in haec verba,* to wit:

"Branch               Stop Payment
Bank of Italy
Head Office: San Francisco
of check drawn by H. Hiroshima
Number 22  dated November 27th
Favor of M. Yamakita
Reason for stopping payment over paid

Date stopped 11–20          Time 3 :30
The undersigned makes the foregoing re-
quest as an act of courtesy only, and
hereby indemnifies you against, and
releases you from all liability by reason of
compliance or non-compliance therewith.

H. HIROSHIMA

Address
Ack. paying teller R. M.
     F. M. Y.
Bookkeeper Arthur Caton
Statem't Clerk.''

And, also as a special defense, pleaded in its answer as
follows:

''That said plaintiff on or about the 18th day of Novem-
ber, 1924, purchased from M. Yamakita a restaurant located
on 'K' Street in the City of Sacramento, State of California,
and entered into, and has since remained in the possession
of said restaurant.  That the check mentioned and described
in paragraph 'III' of the complaint herein was by plaintiff
issued and delivered to said M. Yamakita in payment of
the purchase price of said restaurant, and was accepted by
said M. Yamakita as a full payment of said purchase price.
That said M. Yamakita in the regular and due course of
business endorsed, signed and transferred said check to. S.
Fujita, who paid to said M. Yamakita the amount of said
check, and the payment thereof by defendant to said S.
Fujita did not injure or damage the said plaintiff, who, at
the time said check was received, and has ever since, and
now has and retains the full value and consideration for
said check.''

[1]  In support of its demurrer, the appellant makes the
following argument: ''The most striking omission of the
complaint is found in the absence of any allegation that
plaintiff was damaged by the defendant's payment of plain-
tiff's check.  The complaint purports to count upon a breach
of the agreement not to pay a check, or upon a tort for the
negligent or careless payment of said check.  In either event
the plaintiff should have alleged that he was damaged by the
act complained of, or should have set forth how or in what
manner he was damaged in the premises.''

A reference to section 426 of the Code of Civil Procedure discloses a complete answer to the appellant's contention as to the sufficiency of the complaint. Here we have a statement of the facts constituting a cause of action in ordinary and concise language, to wit: The money on deposit, the issuance of the check, the giving of the stop-notice and the failure of the defendant to observe the same, a demand for the money, a statement that it has not been paid and the prayer of the complaint for the recovery of the money. The third subdivision of section 426 of the Code of Civil Procedure requires a statement of either the sum of money sought to be recovered or the amount of damages, not both. The citation (8 Cal. Jur. 882) upon which the appellant relies to sustain his demurrer does not require anything further that is stated in the plaintiff's complaint. It is there said: "A demand for the relief which the plaintiff claims. If the recovery of money or damages be demanded, the amount thereof must be stated. . . . The rule is sustained in many decisions that a complaint which states the facts showing the plaintiff's damage, in a manner sufficient to sustain a judgment, and concludes with a prayer for damages in a named sum, is sufficient though it fails to contain a formal allegation that plaintiff has been damaged in a stated amount." Here the complaint alleged that the plaintiff had so much money on deposit in defendant's bank, that the defendant wrongfully paid out a certain sum thereof and recovery of that sum is demanded. This constitutes all the facts necessary to show that plaintiff's money has been wrongfully paid out by the defendant. Any further allegation would be surplusage. [2] Where the payment of a certain sum of money is alleged to have been wrongfully made, the amount of damages suffered necessarily appears from the statement of the facts thus set forth. [3] Whether there was or was not any consideration moving between the plaintiff and Yamakita for the issuance of the check is a matter entirely collateral to the issues presented to the trial court in this action as to whether the defendant did or did not wrongfully pay out the plaintiff's money. While the relation between the bank and a depositor is that of creditor and debtor, yet for the purpose of paying the check it was subject to the orders of the plaintiff in relation to the payment of said check, irrespective of whether Yama-

kita was or was not a holder in due course. The appellant further in its argument along this line cites the case of *Unaka National Bank* v. *Butler*, 113 Tenn. 574 [83 S. W. 655], *Usher* v. *Tucker*, 217 Mass. 444 [L. R. A. 1917F, 826, 105 N. E. 360], and *Raesser* v. *National Exch. Bank*, 112 Wis. 591 [88 Am. St. Rep. 979, 56 L. R. A. 174, 88 N. W. 618]. The Unaka and Raesser cases support the rule that as against a holder in due course the drawer of a check has no right to stop payment. The case of *Usher* v. *Tucker, supra,* does not support the rule and has either been erroneously cited or incorrectly applied. In this state where a check has been held to operate as an assignment of the funds in the bank, the two cases cited by the appellant would be authority, but such is not the case in California. **[4]** Section 3265e of the Civil Code reads: "A check of itself does not operate as an assignment of any part of the .funds to the credit of the drawer with the bank, and the bank is not liable to the holder unless and until it accepts or certifies the check." In line with this section we find the supreme court, in the case of *Sneider* v. *Bank of Italy*, 184 Cal. 595, 598 [12 A. L. R. 993, 194 Pac. 1021], thus states the law: "In this state a bank check is a direction by a creditor to a debtor for the disposition of funds, and it does not operate as an assignment of the funds themselves unless and until the bank accepts or certifies the check. (Civ. Code, sec. 3265e.) Consequently, the vitality of a check, at least where it has not been accepted or certified prior to the knowledge of the death of the depositor, ceases upon receipt of such knowledge by the bank, and a bank which pays such a check after knowledge of the death of the depositor is liable to the estate of the depositor. (*Pullen* v. *Placer County Bank,* 138 Cal. 169 [94 Am. St. Rep. 19, 66 Pac. 740, 71 Pac. 83]; 35 Ann. Cas. 443, note; 7 C. J. 702.)"

**[5]** The rule followed in this state and the one followed by the great weight of authority is stated in 7 C. J. 701 as follows: "As a general rule the drawer of an uncertified check can revoke his order for the payment of his funds, or in banking phraseology 'stop payment' at any time before the bank's acceptance of the check, and the bank is bound by such revocation and has no right to pay the check after notice thereof." The rule, as stated in Corpus Juris, is supported by authorities too numerous to be set forth

herein. That the drawer is liable to the holder of the check for the consequences of his conduct in stopping payment is a different matter. This is the point which was considered in the case of *Usher* v. *Tucker,* 217 Mass. 444 [L. R. A. 1916F, 826, 105 N. E. 360], erroneously cited by appellant as supporting a different rule. The court there said: ''It is true that the drawer may stop the payment of the check, and as between him and the bank the latter in such case pays at its peril, but such an order cannot discharge the liability of the drawer to the payee or one holding under him. Where the payment has been stopped, as above stated, the relations between the drawer and the payee become the same as if the check had been dishonored and notice thereof given to the drawer. And hence the effect so far as respects the drawer is to change his conditional liability to one free from the condition, and his situation is like that of the maker of a promissory note." **[6]** In other words, in the case at bar, the drawee of the check, Yamakita, would have had the right to sue the plaintiff for any damages suffered by him by reason of the stopping of payment of the check. Stopping payment of a check does not discharge the liability of the maker to the holder, but the holder must look to the maker for his remedy. (*Edwards* v. *Guaranty etc. Bank,* 48 Cal. App. 787 [192 Pac. 324], *Sneider* v. *Bank of Italy,* 184 Cal. 599 [12 A. L. R. 993, 194 Pac. 1021], and *Pullen* v. *Placer County Bank,* 138 Cal. 169 [94 Am. St. Rep. 19, 66 Pac. 740, 71 Pac. 83].)

In relation to the special defense set up by the defendant, the record shows the following: ''Q. Why did you give him the check? What for you give him the check?" Objected to on the ground that it was no concern of the bank. Objection sustained. ''Mr. McLaughlin: Now, in order to make my point clear, I don't know just what kind of procedure or legal deportment will do—I want to make my record—we offer to prove by this witness now on the stand, and by other witnesses here present, that this check was given by the plaintiff here in payment for a restaurant, and was the purchase price of the restaurant owned by M. Yamakita, and to whom the check was drawn; that Hiroshima entered in possession of the restaurant and still remains in possession, and there has been no payment other than the check. Mr. Henry: We make the same objection to the offer of

proof. Court: That would involve an independent controversy between these two men. Mr. McLaughlin: We simply want to make a record of your Honor's ruling on it. Court: Very well, I will refuse your permission to make that proof." In support of this offer the appellant again cites the case of *Usher* v. *Tucker, supra,* but, as we have seen, the Usher case does not support any such rule of evidence as contended for by the appellant. It does support the rule that Yamakita would be entitled to prosecute an action against the plaintiff for the recovery of damages suffered by him. Any other rule would lead to trial of all outside and collateral matters between the plaintiff and Yamakita as to whether the plaintiff had or had not received full value for his check, whether he had or had not been defrauded in the sale, whether he was induced to purchase the restaurant in question by fraudulent and deceitful practices, and, in fact, all other matters which might be inquired into in an action concerning the sale and purchase of the restaurant referred to and the legality of such sale and the liability of the plaintiff to pay therefor, and, also, the sum of money which he would be liable to pay. A mere statement of these facts is sufficient to show the correctness of the court's ruling. The bank is not interested in the check. It has no interest in the contract between the plaintiff and Yamakita. Its duty is simply to follow the order given by the drawer of the check. It has been held that a bank cannot decline payment of a check by setting up that it was given for an unlawful purpose. (*McCord* v. *California Nat. Bank of San Diego,* 96 Cal. 197 [31 Pac. 51]; Morse on Banks and Banking, 5th ed., secs. 317, 397, and cases there collated. The doctrine that payment cannot be stopped against a holder in due course is only true in those jurisdictions which hold that a check works an assignment of the funds. The cases cited by the appellant so holding are inapplicable here. It may be stated also that in the Unaka case there was no attempt by the drawer to stop payment. In the Raesser case the rule is followed that a check operates as an assignment of the funds of the depositor. We do not find anything in the Negotiable Instruments Law conflicting with or modifying the decisions of this state that a check is not an assignment, or that in anywise modifies or amends

the provisions of section 3265e of the Civil Code heretofore cited.

[7] It is further urged by appellant that the words "the undersigned makes the foregoing request as an act of courtesy only, and hereby indemnifies you against, and releases you from all liability by reason of compliance or noncompliance therewith," contained in the stop-notice absolutely releases the defendant from all liability. The transcript shows that the plaintiff went to the defendant bank and stated to the defendant that he wanted to stop payment on the check herein referred to. Whereupon the following conversation took place: "Q. What did you say? A. I say I want payment stopped. Q. What did he say? A. He says 'all right,' and he say 'how much amount.' Q. How much amount? A. And 'what is name'—I say 'M. Yamakita, my check.' I give check M. Yamakita and amount, $436.50, I think, and I want payment stopped—all right—I can't write,— Q. You can't write? A. No, and he says 'sign.' Q. He gave you some paper? A. Yes; and he says 'this paper there to sign name.' Q. All right, he write down on some paper? A. Yes. Q. And say 'you must sign,' is that right? A. Yes; I no understand if I sign, I ask, he says, 'if you want payment stopped, you must sign' and I understand, and I sign, that is all. Q. Can you read the English language? A. No, I can't read. Q. You couldn't read then, the paper that this man in the bank asked you to sign? A. No, sir. . . . Mr. McLaughlin: I object on the ground you can't impeach writing in that way. . . . The Court: I will hear the evidence. . . . Court: Go ahead. I will hear it. Mr. Henry: What was the question? Court: You asked if he read the English language, and he said he couldn't. Mr. Henry: And that he therefore couldn't read the document that he signed. Q. Could you read the paper that you signed? A. No, I can't read—he says 'sign' that is all, I sign. Q. Did anybody read it to you? A. No. Q. This man in the bank, he no read it to you? A. No, he says 'sign.' "

The court found that the assent and signature to the stop-notice were given by the plaintiff under the influence of mistake and misapprehension and unconscious ignorance of the fact that said instrument contained a provision relieving defendant of liability in the event that it failed to stop payment

of the check.   The court also found as a fact and also drew as
a conclusion of law that the portion of the stop-notice which
we have quoted was against public policy and void, also that
there was no consideration moving from defendant to plain-
tiff for the execution of said agreement and also that the
defendant, contrary to the notification and instruction of
the plaintiff, heedlessly, negligently, and carelessly and
without exercising ordinary or reasonable care, paid the
check upon which the stop-notice was given, etc.   Any one
of these reasons would be sufficient to support the judg-
ment.   (*Wolfsen* v. *Smyer*, 178 Cal. 775, 785 [175 Pac. 10] ;
*Moore* v. *Copp*, 119 Cal. 429–436 [51 Pac. 630] ; *Brison* v.
*Brison*, 90 Cal. 323 [27 Pac. 186].)   [8]   The testimony
showing the condition under which the stop-notice was
signed, the fact that the plaintiff was unable to read the
English language, the fact that the stop-notice was not read
to the plaintiff and that he was told that if he wanted pay-
ment on the check stopped "he must sign" the paper pre-
sented to him by the defendant brings the case clearly within
the provisions of section 1577 of the Civil Code.   (See
*Moore* v. *Copp, supra; Los Angeles Co.* v. *New Liverpool
Co.,* 172 Cal. 21 [87 Pac. 1029].)   [9]   It may also be
stated that there is nothing in the law which requires a stop-
notice to be in writing and a verbal or oral notice given by
the plaintiff to the defendant prior to the signing of the
stop-notice was sufficient to require the defendant to observe
such directions and the writing only aided in identifying
the check upon which the stop-notice was given.

[10]   As to whether an agreement is or is not contrary to
public policy, we quote from 14 C. J. 424, section 360: "If
an agreement binds the parties or either of them to do, or if
the consideration is to do, something opposed to the public
policy of the state or nation it is illegal and absolutely void,
however solemnly made.   It is not easy to give a precise
definition of public policy.   It is perhaps correct to say that
public policy is that principle of law which holds that no
person can lawfully do that which has a tendency to be
injurious to the public or against the public good, which may
be designated, as it sometimes has been, the policy of the law
or public policy in relation to the administration of the law.
Where a contract belongs to this class it will be declared
void, although in the particular instance no injury to the

public may have resulted.   In other words, its validity is determined by its general tendency at the time it is made, and if this is opposed to the interest of the public it will be invalid, even though the intent of the parties was good and no injury to the public would result in the particular case.'' Section 1668 of the Civil Code reads: ''All contracts which have for their object, directly or indirectly, to exempt any one from responsibility for his own fraud, or wilful injury to the person or property of another, or violation of law, whether wilful or negligent, are against the policy of the law.'' Section 1670 of the Civil Code reads: ''Every contract by which the amount of damage to be paid, or other compensation to be made, for a breach of an obligation, is determined in anticipation thereof, is to that extent void, except as expressly provided in the next section.'' The next section refers to cases where liquidated damages may be agreed upon where actual damages would be incapable or difficult of ascertainment.

[11] It is not necessary to state that compliance by the defendant with a direction to stop payment of the check is not in law merely an act of courtesy.   It is a bounden duty of a bank when notified to stop payment to use all reasonable efforts to comply with the directions so given. Compliance with one's obligations, while possibly courteously performed, is nothing more or less than doing what one is under obligation to do.   [12] In the case at bar, immediately upon receipt of a verbal notice to stop payment of the check by the plaintiff, it became the legal duty of the defendant to comply therewith.   The matter of the subsequent writing can at best be held nothing more or less, than additional identification of the check upon which notice to stop payment was given or being given.   The wording of the stop-notice which the plaintiff was induced to sign in the manner shown by the evidence releases the defendant from all liability however negligent or otherwise.   In other words, it simply purports to eliminate all the provisions of section 1668 of the Civil Code and leaves the defendant free to follow the directions of the stop-notice or not at its pleasure. That such a writing purporting to relieve the defendant of all liability or responsibility is against public policy scarcely requires argument.   [13] Under the provisions of section 1670 of the Civil Code, if an attempt had been made to

limit the liability of the bank by fixing a definite sum of money, it would have been void, because the injury to the plaintiff, by reason of the negligence of the defendant, is readily capable of ascertainment, to wit: the amount of money wrongfully paid out, theretofore deposited by the plaintiff. Thus, if the defendant and plaintiff could not under the law execute a valid contract limiting damages on account of negligence of the defendant in a definite sum, we do not very well see how the defendant could secure a valid release from all liability on account of subsequent negligent acts. As stated herein, the court expressly found the defendant careless and negligent in the matter and also that the defendant did not exercise ordinary or reasonable care. The sufficiency of the evidence to support this finding does not appear to be challenged by the appellant. That a verbal notice to stop payment is sufficient, see the case of *People's Sav. etc. Trust Co.* v. *Lacey*, 146 Ala. 688 [40 South. 346]. The appellant cites the case of *Tremont Trust Co.* v. *Burack*, 235 Mass. 398 [9 A. L. R. 1067, 126 N. E. 782], where a provision in the stop-notice read: ''The undersigned agrees to hold the Tremont Trust Company harmless for said amount and for all expenses and costs incurred by it on account of refusing payment of said check and further agrees not to hold the Tremont Trust Company liable on account of payment contrary to this request if same occur through inadvertence or accident.'' The court in the decision of that case stated: ''It is manifest the quoted words were intended to exonerate the bank from the kind of negligence shown by the record, and we are unable to see anything illegal, or anything opposed to public policy, in a stipulation or agreement which relieves a bank so circumstanced from the results of the mere inattention, carelessness, oversightedness, or mistakes of its employees.'' Whether the state of Massachusetts has a code similar to ours has not been called to our attention, but aside from that question, it is manifest that if it be considered to be an agreement exonerating the defendant from all negligence in the observance of the stop-notice, as was the attempt made in this case, the Massachusetts decision is not in harmony with our code provisions, nor with the California cases where attempts have been made to absolutely relieve the parties for any kind of negligent acts. Nor is the Massachusetts case

in harmony with the decisions of other courts which follow along the line of recent decisions by the courts of this state, when considering attempts to relieve one's self from negligence. In 3 R. C. L. 708, section 340, the rule is thus stated: "Notwithstanding a by-law of a savings bank which exempts the institution from liability for payments made to a person other than a depositor when the depositor's book is presented and the depositor has given the bank no notice of the loss of the book, the bank is nevertheless liable for a payment to the wrong person if by ordinary diligence it could have discovered the fraud and negligently failed to do so; this is so because public policy will not allow the bank to strip itself of responsibility by contract as to enable it safely to pay, intentionally or heedlessly, to one who has come into the possession of the pass book fraudulently or criminally." See, also, *Hough Ave. Sav. Bank* v. *Anderson,* 78 Ohio St. 341 [125 Am. St. Rep. 707, 18 L. R. A. (N. S.) 431, 85 N. E. 498]. In the case of *Elder* v. *Franklin Nat. Bank,* 25 Misc. Rep. 716 [55 N. Y. Supp. 576], a provision in the stop-notice in the following words was held void: "It is further agreed that the bank shall not be responsible for the execution of an order to stop payment of a check previously drawn; that the bank will endeavor to execute such orders, but that no liability shall be created by failure so to do; and that no rule, usage or custom shall be construed to create such liability." This case goes on to hold that it is against public policy to permit a bank to relieve itself from the consequences of its negligent acts and is in harmony with the code provisions of this state and the decisions of other courts to the effect that it is against public policy to permit agreements exempting one from his own negligence. Section 1667 of the Civil Code provides that that is unlawful which is contrary to an express provision of law, contrary to the policy of express law, though not expressly prohibited, or otherwise contrary to good morals. In 13 C. J. 491, section 437, the rule in relation to exempting one's self by contract from liability for negligence between the master and his servant is thus stated: "While it cannot be said that without exception all contracts against liability for negligence are against public policy, the general rule is that it is against the policy of the law to permit a master to contract against liability for the

negligence of his servants while acting within the scope of their employment. . . . Further, by the weight of authority, a master cannot, by agreement with his servant, exempt himself from liability for injuries to the servant caused by his negligence or by the negligence of those who, though engaged in the same service, are superior in authority and control." In 6 R. C. L. 427, section 132, the reason why such provisions are against public policy is set forth: "Undoubtedly contracts exempting persons from liability for negligence induce a want of care, for the highest incentive to the exercise of due care rests in a consciousness that a failure in this respect will fix liability to make full compensation for any injury resulting from this cause. In.has therefore been declared to be good doctrine that no person may contract against his own negligence." In the case at bar, the banking public, as well as the particular individual who may be concerned in the giving of any stop-notice, is interested in seeing that the bank is held accountable for the ordinary and regular performance of its duties and, also, in seeing that direction in relation to the disposition of funds deposited in bank are not heedlessly, negligently, and carelessly disobeyed and money paid out, contrary to directions given. The case at bar is not one like that presented in *Stephens* v. *Southern Pac. Co.,* 109 Cal. 86 [50 Am. St. Rep. 17, 29 L. R. A. 751, 41 Pac. 783], where one of the contracting parties was at liberty to make a contract or not make it, but if made, entered into upon such terms and conditions and limitations as it might elect. Here the bank had a definite and legal duty to perform. It does not present a case of election to enter into a contract, but an instance where the duty .cannot be declined. It may also be added that the testimony shows the parties in this case were not contracting upon an equal basis; one was desirous of having money in the hands of the other held subject to his order and payment of a certain check stopped, and at the same time not able to read the writing to which his signature was demanded; the other had the funds in its possession, which the law made subject to the order of the depositor, and yet demanding the signature of the depositor to said writing waiving liability before it would undertake to perform its legal duty. In the case of *Union Const. Co.* v. *Western Union Tel. Co.,* 163 Cal. 298 [125 Pac. 242],

the question of escaping liability for one's own negligence by contract is considered at length and the cases upholding such contracts criticised and the difficulty of reconciling such cases with the provisions of section 1668 of the Civil Code pointed out and, also, the cases holding that such contracts are against public policy collected.

The judgment of the trial court is affirmed.

Needham, J., *pro tem.,* and Hart, J., concurred.

A petition by appellant to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on August 12, 1926.