## HODNICK *v.* FIDELITY TRUST COMPANY

[No. 14,387.   Filed December 13, 1932.   Rehearing denied April 6, 1933.]

*L. William Curry* and *A. W. Fenstermacher,* for appellant.

*Rocap & McShane,* for appellee.

CURTIS, C. J.—This was an action brought in the lower

court by the appellant, Louie J. Hodnick, against the appellee, Fidelity Trust Company, for money had and received. The complaint was in one paragraph, to which was filed an answer in three paragraphs. The first paragraph of answer was a general denial; to the second paragraph of answer the appellant demurred, which demurrer was sustained and no amended second paragraph of answer was filed. The third paragraph of answer alleged that at the time of the commencement of the action appellee had no money to which the appellant was entitled or of which the appellant was the owner, except 77 cents. To this paragraph of answer the appellant filed a reply in general denial thus closing the issues. Upon the issues thus formed the cause was tried by the court who made a general finding in favor of the appellee and against the appellant that he take nothing by his complaint. Appellant filed a motion for a new trial which was overrruled, and judgment was rendered on said finding in favor of the appellee. From this judgment the appellant prayed and perfected this appeal assigning as error that the court erred in overruling appellant's motion for a new trial. The motion for a new trial contained the following causes, to-wit: "(1) That the decision of the court is not sustained by sufficient evidence; (2) That the decision of the court is contrary to law."

Most of the evidence is not in conflict and it establishes the following facts, to-wit: That the appellant had a general checking account in the appellee bank in a sum in excess of $235.00; that on March 23, 1929, while said money was on deposit the appellant issued a check thereon in favor of one Lena Hummel who lived in another city; that on March 25, 1929, and before the check had been cashed at the said bank, the appellant called at the bank to stop payment on the check; that at said time to secure a stop payment on said check he

signed a written stop payment order which is in words and figures as follows:

"Please endeavor to stop payment of my-our check.
Date, March 25, 1929.
Drawn by L. J. Hodnick. No. 10, $235. Favor of Mrs. Lena Hummel. Dated March 30, 1929. Reason, In asking this courtesy the undersigned agrees to hold the above named bank harmless for said amount and for all expenses and costs incurred by it on account of refusing payment of said check, and further agrees not to hold the said bank liable on account of payment contrary to this request if made through inadvertence or accident. If a duplicate check is issued or if the original check is returned, the undersigned agrees to notify the bank promptly, if this request is not previously revoked, the undersigned agrees that it will automatically expire at the end of sixty days unless a new request is made before that time for the stop payment to continue in force. To—Signed L. J. Hodnick."

In considering the evidence most favorable to the appellee, as we are required to do, we find that Albert E. Lamb, a witness, testified in substance that he was the auditor for the appellee and as such he supervises the accounts of the bank and that the bookkeepers are under his supervision; that appellant had a deposit at the bank and that the depositors' names are kept in ledgers divided into eight sections according to the alphabet; that one of the two bookkeepers for the bank, Rose Prang, had charge of the ledger containing the appellant's name and that she died on Saturday, April 6, 1929, on the day the check in question was paid; that Hortense Mack had been taken off of the bank's general books and placed in charge of the work Miss Prang had been doing; that Miss Mack was experienced on deposit ledgers; that stop payment orders are kept in alphabetical order; that the said check was paid at the time Miss Mack was on the books and that it was not paid through the window but was paid through the clearing house and bears the endorsement of the

Mercantile Commercial Bank of Evansville where the payee lived. The witness then described in detail the banking and clearing house methods used on Saturdays and we quote that part of his testimony as shown in appellant's brief as follows: "Our banking hours Saturday are the same but the clearing house hours are not the same; the clearing house hours are 2:45 week days and 1:30 on Saturday. When a check comes in through the clearing house on a Saturday it is paid when presented at the window, giving the messenger from the bank that presents them our check in payment of them. Any checks that are found not to be good must be returned by the limit placed by the clearing house which is 1:30. A check drawn on an Indianapolis bank and coming from Evansville, and in possession of the Fletcher American Bank who is likely the correspondent bank with the bank at Evansville, the Fletcher American Bank makes a list of all their checks they have on the respective banks, in this case it would be the Fidelity Trust Company and they are sent to the Clearing House Association and from the clearing house they make a record of the items and then the messenger presents the checks to the banks on which they are drawn. The Clearing House only lists the total of these checks, then the clearing house messenger comes to our bank, leaves the check and gets our check and payable to the Fletcher American Bank in payment of these checks, we have an opportunity to look at those checks on the list from the time that he leaves them up until the end of the clearing house hours which is 1:30 on Saturday. Saturday is ordinarily a very busy day and in the rush of business there, it is possible that a check could have been paid even though a stop payment had been issued. Miss Prang died on the 6th of April, the same day on which the check was paid.

CROSS-EXAMINATION

"This check was cashed on April 6, and the words in red ink 'payment stopped' on the check were put on the check after it was paid in an effort to return it to the bank through which it came the following day, or at the time it was discovered as having been paid contrary to the stop order."

Hortense Mack testified in part as follows: "I had nothing to do with the deposit ledgers or the stop payment orders. After Miss Prang was taken ill I posted her ledgers, among which was the ledger in which Mr. Hodnick's account was in. I was not acquainted with practice of stop payment orders. Do not recall date when this check for $235.00 was paid, I did post it. When a check comes in it is handed to the bookkeeper who has that account, to post it on the books. I do not recall posting Mr. Hodnick's check for $235.00 against his account. I did not know of this stop payment order at the time; I learned about it several days after, and about his check having been paid. I learned of Miss Prang's death on Saturday and we were all very excited and worked up over it. I believe Miss Prang had been at the bank ten years to my knowledge; was well acquainted with her and with her frequently. Received the news of Miss Prang's death between 11 and 11:30. It was about this time the clearings were coming through.

"This check was cashed or paid on April 6, on the day Miss Prang died. I was only on those books that week; Miss Prang was sick at that time. Mr. Hodnick's check was posted with me. I did not know of Mr. Hodnick's stop order payment of this check; he did not order the stop order through me."

The only question involved in this appeal is whether, under the law, and under the evidence most favorable to the appellee, it is released from liability by reason of

the "stop payment order" heretofore set out, which, among other things, provided that the appellant "further agrees not to hold the bank liable on account of payment contrary to this request, if made through inadvertence or accident." It was intended by the bank that its common law liability would be limited by said order, where payment was made through inadvertence or accident.

If the "stop payment order" was founded upon a sufficient consideration and was not void as against public policy, and if the evidence warrants a finding that the payment of the check was made through inadvertence or accident then the judgment of the lower court should be affirmed, otherwise it must be reversed. Before proceeding with the determination of those questions we may say that so far as we are advised they are new in Indiana, and in fact they have been before the courts of last resort in but few states. We will take them up in the order mentioned.

In *Tremont Trust Company* v. *Burack* (1920), 235 Mass. 398, 126 N. E. 782, 784, 9 A. L. R. 1067, in deciding a case similar to the instant case, the court said: "The consideration for an expressed agreement or for the implied obligation not to pay a holder of a check after payment of it has been stopped is found in and springs from the mercantile relation of the parties and the reciprocal rights and obligations which the law attaches to that relation." See also *Gaita* v. *Windsor Bank* (1929), 251 N. Y. 152, 167 N. E. 203. The above two cases are the leading cases in the United States on the exact questions before us, and in our opinion they are well considered, and we adopt the reasoning therein as to the sufficiency of the consideration for the "stop payment order." In the *Tremont Trust Company* v. *Burack* case, *supra,* the court also said: "The word inadvertence in the printed agreement embraces the effect of inattention, the result of carelessness, oversight, mistake, or fault of negli-

gence and the condition or character of being inadvertent, inattentive, or heedless. The word 'accident' is used in the sense of a happening of an event without the concurrence of the will of the person by whose agency it was caused. It is manifest the quoted words were intended to exonerate the bank from the kind of negligence shown by the record, and we are unable to see anything illegal, or anything opposed to public policy, in a stipulation or agreement which relieves a bank so circumstanced from the results of mere inattention, carelessness, oversightedness, or mistake of its employees." In the case of *Gaita* v. *Windsor Bank, supra,* the court said: "The common law liability of a bank in regard to a specific transaction may be limited provided the limitation has the assent of the depositor. In such a situation the clearly expressed intention of the parties will prevail and the rule of 'freedom of contract' will be enforced. *Isler* v. *National Bank of New York* (1925), 239 N. Y. 462, 147 N. E. 66; *Tremont Trust Company* v. *Burack, supra,* 27 Columbia Law Review 294.

"The notice served on the bank by the plaintiff is clear and unambiguous. There can be no mistake in regard to its meaning. The plaintiff, in effect, notified the bank that he had given a check which was valid, but that he had changed his mind and did not want the check paid. He said however, in effect, 'If you (the bank) do pay it through inadvertence, I will not hold you responsible.' He had a legal right to serve such notice, qualifying the bank's common law liability, and, when the bank paid the check, after receipt of such notice, it did not become legally liable to the drawer in the absence of evidence of wilful disregard of the notice.

"If the drawer desires to hold a bank to its common law liability and impose upon it absolute duty of stopping payment of a check, the notice served on the bank should

be positive and unqualified. Then, if the bank does not desire to assume the liability imposed by such a notice, it may cancel the account and terminate its relationship with the depositor. On the other hand, if the drawer serves a qualified or limited notice like the one in question, the obligation of the bank is thereby limited, and it will not be liable to the drawer if the check is inadvertently paid."

In the case of *Cohen* v. *State Bank of Philadelphia* (1918), 69 Pa. Superior Court Reports 40, the court, in a similar case, said: "Plaintiff was not required to use the form of order, but since he chose in writing to ask the bank to stop payment as an act of courtesy and not as a matter of right, he cannot now complain if the bank be relieved from liability by reason of the terms of the order which he gave. We think, under the facts as developed in the case, the bank cannot be held."

Judge Thomas B. Paton, Jr., general counsel for the American Bankers' Association, in his Digest, Revision of 1926, section 4463-A, says: "While a depositor has a legal right to arbitrarily order payment of his check stopped, the written instrument is a request rather than an order or notice, because by it the depositor is asking the bank to do an abnormal thing. The bank's normal function is to pay the valid checks of its depositors, and because of this the bank feels that it should not be unduly burdened and held strictly accountable in carrying out the depositor's request, but should only be called upon to use its best efforts to stop payment."

Public policy is a term that is not always easy to define. It may vary as the habits, opinions and wants of a people may vary, and what may be the public policy of one state or country, may not be so in another. The principle of public policy seems to have been earliest applied to agreements to promote litigation, or marriage, or in an endeavor to elude the binding effect of

wagers at common law. The field of application has been an ever increasing one. In the absence of a showing that any particular contract brought before the court is contrary to what the constitution, the legislature or the judiciary have declared to be the public policy, it is necessary in order to have the court hold it void on the ground of public policy, to show clearly that such contract has a tendency to injure the public, or is against the public good or is inconsistent with sound policy and good morals as to the consideration or as to the thing to be done or not to be done. Whether or not a contract is against public policy is a question of law for the court to determine from all of the circumstances in a particular case. The courts will keep in mind the principle that it is to the best interest of the public that persons should not be unnecessarily restricted in their freedom of contract and that their agreements are not to be held void as against public policy, unless they are clearly contrary to what the constitution, the legislature, or the judiciary have declared to be the public policy or unless they clearly tend to the injury of the public in some way.

Applying the principles of law announced in this opinion and in the cases and text above cited, we conclude that the "stop payment order" in this case was based upon a sufficient consideration and that it is not in Indiana void as against public policy, and that the finding of the court should not be disturbed upon these two grounds. In *Hiroshima* v. *Bank of Italy* (1926), 78 Cal. App. 362, 248 Pacific 947, a different result was reached from that reached herein, but by a careful reading of that case it readily appears that a different set of facts was presented to the court from those presented in the *Tremont Trust Company* v. *Burack case, supra,* or in the instant case. There, it appeared that the "stop payment order" was executed by one who could not read and write English, and that it was not read to him and

that he was told that he must sign in order to stop payment. The court held those facts showed a mistake of fact so that the agreement in such notice to release the defendant from liability in case of payment was not binding. California also has a code provision that was construed to apply. In speaking of the Fremont case, supra, the court said: "Whether the state of Massachusetts has a code similar to ours has not been called to our attention; but aside from that question it is manifest that, if it be considered to be an agreement exonerating the defendant from all negligence in the observance of the stop notice, as was the attempt made in this case, the Massachusetts decision is not in harmony with our Code provisions, nor with the California cases, where attempts have been made to absolutely relieve the parties for any kind of negligent acts." Clearly the California case is not in point on the controlling questions of the instant case. Even the "stop payment order" in that case, as has been above indicated, was greatly different from the one in the case before us, and we have no constitutional or legislative provision such as they have in California, neither have we any decisions of our courts holding such a contract void as against public policy. There remains to be considered the question as to whether the evidence most favorable to the appellee is such as to sustain the finding of the trial court that the payment of the check in question was made through inadvertence or accident. The evidence shows that the check was presented to appellee for payment through the Indianapolis Clearing House on Saturday and at a rush hour; that the clerk who regularly had charge of the appellant's account was not on duty, in fact had died a few hours before the check was presented for payment; that a substitute girl was working on that ledger, the substitute not having had previous experience in connection with stop payment orders, and that on account of the inexperience of such clerk, and her in-

advertence and mistake, the check was paid. We believe the evidence is sufficient to sustain the finding of the court. We have found no reversible error.

The judgment is affirmed.