[No. A027810. First Dist., Div. Five. Mar. 28, 1986.]

JHORDAN C., Plaintiff and Respondent, v.
MARY K., Defendant and Appellant;
VICTORIA T., Intervener and Appellant.

**COUNSEL**

Roberta Achtenberg for Defendant and Appellant and for Intervener and Appellant.

Catherine M. Steane and Orrick, Herrington & Sutcliffe as Amici Curiae on behalf of Defendant and Appellant and Intervener and Appellant.

Annette Lombardi for Plaintiff and Respondent.

Marteen J. Miller, Public Defender, and Stephany L. Joy, Deputy Public Defender, for Minor.

**OPINION**

**KING, J.—**

## I. Holding

By statute in California a "donor of semen *provided to a licensed physician* for use in artificial insemination of a woman other than the donor's wife is treated in law as if he were not the natural father of a child thereby conceived." (Civ. Code, § 7005, subd. (b); italics added.) In this case we hold that where impregnation takes place by artificial insemination, and the parties have failed to take advantage of this statutory basis for preclusion of paternity, the donor of semen can be determined to be the father of the child in a paternity action.

Mary K. and Victoria T. appeal from a judgment declaring Jhordan C. to be the legal father of Mary's child, Devin. The child was conceived by artificial insemination with semen donated personally to Mary by Jhordan. We affirm the judgment.

## II. Facts and Procedural History

In late 1978, Mary decided to bear a child by artificial insemination and to raise the child jointly with Victoria, a close friend who lived in a nearby town.[1] Mary sought a semen donor by talking to friends and acquaintances. This led to three or four potential donors with whom Mary spoke directly. She and Victoria ultimately chose Jhordan after he had one personal interview with Mary and one dinner at Mary's home.

The parties' testimony was in conflict as to what agreement they had concerning the role, if any, Jhordan would play in the child's life. According to Mary, she told Jhordan she did not want a donor who desired ongoing involvement with the child, but she did agree to let him see the child to satisfy his curiosity as to how the child would look. Jhordan, in contrast, asserts they agreed he and Mary would have an ongoing friendship, he would have ongoing contact with the child, and he would care for the child as much as two or three times per week.

None of the parties sought legal advice until long after the child's birth. They were completely unaware of the existence of Civil Code section 7005. They did not attempt to draft a written agreement concerning Jhordan's status.

---

[1] As many as 20,000 women each year are artificially inseminated in the United States. (Note, *Reproductive Technology and the Procreation Rights of the Unmarried* (1985) 98 Harv.L.Rev. 669, fn. 1.) By one estimate some 1,500 of these women are unmarried. (Donovan, *The Uniform Parentage Act and Nonmarital Motherhood-by-Choice* (1982-1983) 11 N.Y.U. Rev. L. & Soc. Change 193, 195.)

Jhordan provided semen to Mary on a number of occasions during a six-month period commencing in late January 1979. On each occasion he came to her home, spoke briefly with her, produced the semen, and then left. The record is unclear, but Mary, who is a nurse, apparently performed the insemination by herself or with Victoria.

Contact between Mary and Jhordan continued after she became pregnant. Mary attended a Christmas party at Jhordan's home. Jhordan visited Mary several times at the health center where she worked. He took photographs of her. When he informed Mary by telephone that he had collected a crib, playpen, and high chair for the child, she told him to keep those items at his home. At one point Jhordan told Mary he had started a trust fund for the child and wanted legal guardianship in case she died; Mary vetoed the guardianship idea but did not disapprove the trust fund.

Victoria maintained a close involvement with Mary during the pregnancy. She took Mary to medical appointments, attended birthing classes, and shared information with Mary regarding pregnancy, delivery, and child rearing.

Mary gave birth to Devin on March 30, 1980. Victoria assisted in the delivery. Jhordan was listed as the father on Devin's birth certificate.[2] Mary's roommate telephoned Jhordan that day to inform him of the birth. Jhordan visited Mary and Devin the next day and took photographs of the baby.

Five days later Jhordan telephoned Mary and said he wanted to visit Devin again. Mary initially resisted, but then allowed Jhordan to visit, although she told him she was angry. During the visit Jhordan claimed a right to see Devin, and Mary agreed to monthly visits.

Through August 1980 Jhordan visited Devin approximately five times. Mary then terminated the monthly visits. Jhordan said he would consult an attorney if Mary did not let him see Devin. Mary asked Jhordan to sign a contract indicating he would not seek to be Devin's father, but Jhordan refused.

In December 1980, Jhordan filed an action against Mary to establish paternity and visitation rights. In June 1982, by stipulated judgment in a separate action by the County of Sonoma, he was ordered to reimburse the county for public assistance paid for Devin's support. The judgment ordered him to commence payment, through the district attorney's office, of $900

---

[2]This occurred as a result of the filing of an amended birth certificate based upon a judgment against Jhordan in Sonoma County's action for reimbursement of public assistance benefits paid for the child.

in arrearages as well as future child support of $50 per month.[3] In November 1982, the court granted Jhordan weekly visitation with Devin at Victoria's home.

Victoria had been closely involved with Devin since his birth. Devin spent at least two days each week in her home. On days when they did not see each other they spoke on the telephone. Victoria and Mary discussed Devin daily either in person or by telephone. They made joint decisions regarding his daily care and development. The three took vacations together. Devin and Victoria regarded each other as parent and child. Devin developed a brother-sister relationship with Victoria's 14-year-old daughter, and came to regard Victoria's parents as his grandparents. Victoria made the necessary arrangements for Devin's visits with Jhordan.

In August 1983, Victoria moved successfully for an order joining her as a party to this litigation. Supported by Mary, she sought joint legal custody (with Mary) and requested specified visitation rights, asserting she was a de facto parent of Devin. (See, e.g., *Guardianship of Phillip B.* (1983) 139 Cal.App.3d 407, 419-421 [188 Cal.Rptr. 781].) Jhordan subsequently requested an award of joint custody to him and Mary.

After trial the court rendered judgment declaring Jhordan to be Devin's legal father. However, the court awarded sole legal and physical custody to Mary, and denied Jhordan any input into decisions regarding Devin's schooling, medical and dental care, and day-to-day maintenance. Jhordan received substantial visitation rights as recommended by a court-appointed psychologist. The court held Victoria was not a de facto parent, but awarded her visitation rights (not to impinge upon Jhordan's visitation schedule), which were also recommended by the psychologist.

Mary and Victoria filed a timely notice of appeal, specifying the portions of the judgment declaring Jhordan to be Devin's legal father and denying Victoria the status of de facto parent.[4]

## III. Discussion

We begin with a discussion of Civil Code section 7005, which provides in pertinent part: "(a) If, under the supervision of a licensed physician and

---

[3] During the pendency of this appeal *Mary sought and obtained an increase* in Jhordan's support obligation.

[4] The Sonoma County Public Defender has filed a brief on behalf of Devin which is *identical* to Jhordan's brief in both form and content, indicating the two briefs were produced in concert. We strongly disapprove of such conduct by counsel for a minor child in custody proceedings, as it substantially compromises counsel's independence.

with the consent of her husband, a wife is inseminated artificially with semen donated by a man not her husband, the husband is treated in law as if he were the natural father of a child thereby conceived. . . . [¶] (b) The donor of semen provided to a licensed physician for use in artificial insemination of a woman other than the donor's wife is treated in law as if he were not the natural father of a child thereby conceived."

Civil Code section 7005 is part of the Uniform Parentage Act (UPA), which was approved in 1973 by the National Conference of Commissioners on Uniform State Laws. (9A West's U.Laws Ann. (1979) Parentage Act, hist. note, p. 579.) The UPA was adopted in California in 1975. (Stats. 1975, ch. 1244, § 11.) Section 7005 is derived almost verbatim from the UPA as originally drafted, with one crucial exception. The original UPA restricts application of the nonpaternity provision of subdivision (b) to a "*married* woman other than the donor's wife." (9A West's U.Laws Ann., *op. cit. supra,* § 5, subd. (b), p. 593; italics added.) The word "married" is excluded from subdivision (b) of section 7005, so that in California, subdivision (b) applies to all women, married or not.[5]

Thus, the California Legislature has afforded unmarried as well as married women a statutory vehicle for obtaining semen for artificial insemination without fear that the donor may claim paternity, and has likewise provided men with a statutory vehicle for donating semen to married and unmarried women alike without fear of liability for child support. Subdivision (b) states only one limitation on its application: the semen must be "provided to a licensed physician." Otherwise, whether impregnation occurs through artificial insemination or sexual intercourse, there can be a determination of paternity with the rights, duties and obligations such a determination entails.

A. *Interpretation of the Statutory Nonpaternity Provision.*

Mary and Victoria first contend that despite the requirement of physician involvement stated in Civil Code section 7005, subdivision (b), the Legislature did not intend to withhold application of the donor nonpaternity provision where semen used in artificial insemination was not provided to a licensed physician. They suggest that the element of physician involvement appears in the statute merely because the Legislature assumed (erroneously) that all artificial insemination would occur under the supervision of a physician. Alternatively, they argue the requirement of physician involvement is merely directive rather than mandatory.

---

[5]This omission also occurs in the versions of the UPA adopted in Wyoming and Colorado. (9A West's U.Laws Ann., *op. cit. supra,* note on action in adopting jurisdictions, p. 593 (1985 supp.) p. 311.)

■ We cannot presume, however, that the Legislature simply assumed or wanted to recommend physician involvement, for two reasons.

First, the history of the UPA (the source of § 7005) indicates conscious adoption of the physician requirement. The initial "discussion draft" submitted to the drafters of the UPA in 1971 did not mention the involvement of a physician in artificial insemination; the draft stated no requirement as to how semen was to be obtained or how the insemination procedure was to be performed. (Krause, Illegitimacy: Law and Social Policy (1971) pp. 240, 243.)[6] The eventual inclusion of the physician requirement in the final version of the UPA suggests a conscious decision to require physician involvement.

Second, there are at least two sound justifications upon which the statutory requirement of physician involvement might have been based. One relates to health: a physician can obtain a complete medical history of the donor (which may be of crucial importance to the child during his or her lifetime) and screen the donor for any hereditary or communicable diseases. Indeed, the commissioners' comment to the section of the UPA on artificial insemination cites as a "useful reference" a law review article which argues that health considerations should require the involvement of a physician in statutorily authorized artificial insemination. (9A West's U.Laws Ann., *op. cit. supra,* comrs. com. to § 5, p. 593, citing Wadlington, *Artificial Insemination: The Dangers of a Poorly Kept Secret* (1970) 64 Nw.U.L.Rev. 777, 803; see also Com., *Artificial Insemination and Surrogate Motherhood—A Nursery Full of Unresolved Questions* (1981) 17 Willamette L.Rev. 913, 926.) This suggests that health considerations underlie the decision by the drafters of the UPA to include the physician requirement in the artificial insemination statute.

Another justification for physician involvement is that the presence of a professional third party such as a physician can serve to create a formal, documented structure for the donor-recipient relationship, without which, as this case illustrates, misunderstandings between the parties regarding the nature of their relationship and the donor's relationship to the child would be more likely to occur.

It is true that nothing inherent in artificial insemination requires the involvement of a physician. Artificial insemination is, as demonstrated here,

---

[6]The pertinent portions of the discussion draft provided: "(a) If the husband has consented to artificial insemination of his wife, a resulting child is the legitimate child of the husband and wife. . . . [¶] (b) The donor of semen used in artificial insemination has no legally recognized relationship with a resulting child. An existing relationship is not affected." (Disc. draft, UPA, § 5 (1971) quoted in Krause, *op. cit. supra,* p. 243.)

a simple procedure easily performed by a woman in her own home. Also, despite the reasons outlined above in favor of physician involvement, there are countervailing considerations against requiring it. A requirement of physician involvement, as Mary argues, might offend a woman's sense of privacy and reproductive autonomy, might result in burdensome costs to some women, and might interfere with a woman's desire to conduct the procedure in a comfortable environment such as her own home or to choose the donor herself.[7]

However, because of the way section 7005 is phrased, a woman (married or unmarried) can perform home artificial insemination or choose her donor and still obtain the benefits of the statute. Subdivision (b) does not require that a physician independently obtain the semen and perform the insemination, but requires only that the semen be "provided" to a physician. Thus, a woman who prefers home artificial insemination or who wishes to choose her donor can still obtain statutory protection from a donor's paternity claim through the relatively simple expedient of obtaining the semen, whether for home insemination or from a chosen donor (or both), through a licensed physician.

Regardless of the various countervailing considerations for and against physician involvement, our Legislature has embraced the apparently conscious decision by the drafters of the UPA to limit application of the donor nonpaternity provision to instances in which semen is provided to a licensed physician. The existence of sound justifications for physician involvement further supports a determination the Legislature intended to require it. Accordingly, section 7005, subdivision (b), by its terms does not apply to the present case. The Legislature's apparent decision to require physician involvement in order to invoke the statute cannot be subject to judicial second-guessing and cannot be disturbed, absent constitutional infirmity.

### B. Constitutional Considerations.

Mary and Victoria next contend that even if section 7005, subdivision (b), by its terms does not apply where semen for artificial insemination has not been provided to a licensed physician, application of the statute to the present case is required by constitutional principles of equal protection and privacy (encompassing rights to family autonomy and procreative choice).

---

[7]One article on the subject of artificial insemination notes that many women prefer to choose a known donor because this "eliminates potential difficulties in gaining access to medical information, permits the prospective mother to make the choice of donor herself, and allows the child access to paternal roots." (Kern & Ridolfi, *The Fourteenth Amendment's Protection of a Woman's Right to be a Single Parent through Artificial Insemination by Donor* (1982) 7 Women's Rts. L.Rptr. 251, 256.)

## 1. Equal protection.

Mary and Victoria argue the failure to apply section 7005, subdivision (b), to unmarried women who conceive artificially with semen not provided to a licensed physician denies equal protection because the operation of other paternity statutes precludes a donor's assertion of paternity where a *married* woman undergoes artificial insemination with semen not provided to a physician.

This characterization of the effect of the paternity statutes as applied to married women is correct. In the case of the married woman her husband is the presumed father (Civ. Code, § 7004, subd. (a)(1)), and *any* outsider—including a semen donor, regardless of physician involvement—is precluded from maintaining a paternity action unless the mother "relinquishes for, consents to, or proposes to relinquish for or consent to, the adoption of the child." (Civ. Code, § 7006, subd. (d).) An action to establish paternity by blood test can be brought only by the husband or mother. (Evid. Code, § 621, subds. (c) & (d); see *Vincent B. v. Joan R.* (1981) 126 Cal.App.3d 619 [179 Cal.Rptr. 9]; *Ferguson* v. *Ferguson* (1981) 126 Cal.App.3d 744 [179 Cal.Rptr. 108].)

But the statutory provision at issue here—Civil Code section 7005, subdivision (b)—treats married and unmarried women equally. Both are denied application of the statute where semen has not been provided to a licensed physician.

The true question presented is whether a completely different set of paternity statutes—affording protection to husband and wife from any claim of paternity by an outsider (Civ. Code, §§ 7004, 7006; Evid. Code, § 621)—denies equal protection by failing to provide similar protection to an unmarried woman. The simple answer is that, within the context of this question, a married woman and an unmarried woman are not similarly situated for purposes of equal protection analysis. In the case of a married woman, the marital relationship invokes a long-recognized social policy of preserving the integrity of the marriage. (See *Estate of Cornelious* (1984) 35 Cal.3d 461, 465 [198 Cal.Rptr. 543, 674 P.2d 245]; *Vincent B.* v. *Joan R., supra,* 126 Cal.App.3d at p. 624.) No such concerns arise where there is no marriage at all. Equal protection is not violated by providing that certain benefits or legal rights arise only out of the marital relationship. For example, spousal support may be awarded pursuant to Civil Code section 4801 upon the breakup of a marital relationship, but not upon the breakup of a nonmarital relationship.

2. Family autonomy.

■ Mary and Victoria contend that they and Devin compose a family unit and that the trial court's ruling constitutes an infringement upon a right they have to family autonomy, encompassed by the constitutional right to privacy. But this argument begs the question of which persons comprise the family in this case for purposes of judicial intervention. Characterization of the family unit must precede consideration of whether family autonomy has been infringed.

The semen donor here was permitted to develop a social relationship with Mary and Devin as the child's father. During Mary's pregnancy Jhordan maintained contact with her. They visited each other several times, and Mary did not object to Jhordan's collection of baby equipment or the creation of a trust fund for the child. Mary permitted Jhordan to visit Devin on the day after the child's birth and allowed monthly visits thereafter. The record demonstrates no clear understanding that Jhordan's role would be limited to provision of semen and that he would have no parental relationship with Devin; indeed, the parties' conduct indicates otherwise.

We do not purport to hold that an oral or written nonpaternity agreement between the parties would have been legally binding; that difficult question is not before us (and indeed is more appropriately addressed by the Legislature). We simply emphasize that for purposes of the family autonomy argument raised by Mary, Jhordan was not excluded as a member of Devin's family, either by anonymity, by agreement, or by the parties' conduct.

In short, the court's ruling did not infringe upon any right of Mary and Victoria to family autonomy, because under the peculiar facts of this case Jhordan was not excluded as a member of Devin's family for purposes of resolving this custody dispute.

3. Procreative choice.

■ Mary and Victoria argue that the physician requirement in Civil Code section 7005, subdivision (b), infringes a fundamental right to procreative choice, also encompassed by the constitutional right of privacy.

But the statute imposes no restriction on the right to bear a child. Unlike statutes in other jurisdictions proscribing artificial insemination other than by a physician,[8] subdivision (b) of section 7005 does not forbid self-insem-

---

[8]Statutes in at least four states (Connecticut, Georgia, Oklahoma, and Oregon) make it illegal for a person other than a physician to perform artificial insemination; an Idaho statute requires that artificial insemination be performed by or under the supervision of a physician. (See 1 Schatkin & Andrews, Disputed Paternity Proceedings (4th ed. rev. 1985) § 1.06, p. 1-26.1.)

ination; nor does the statute preclude personal selection of a donor or in any other way prevent women from artificially conceiving children under circumstances of their own choice. The statute simply addresses the perplexing question of the legal status of the semen donor, and provides a method of avoiding the legal consequences that might otherwise be dictated by traditional notions of paternity.

## C. *Victoria's Status as a De Facto Parent.*

Finally, Mary and Victoria contend that even if the paternity judgment is affirmed Victoria should be declared a de facto parent, based on her day-to-day attention to Devin's needs (see *Guardianship of Phillip B., supra,* 139 Cal.App.3d at pp. 419-421), in order to guarantee her present visitation rights and ensure her parental status in any future custody or visitation proceedings. Present resolution of the de facto parenthood issue for these purposes would be premature and merely advisory. Victoria's visitation rights have been legally recognized and preserved by court order. If no further custody or visitation proceedings occur, the issue of Victoria's de facto parent status and its legal effect will never arise.[9]

## IV. Conclusion

We wish to stress that our opinion in this case is not intended to express any judicial preference toward traditional notions of family structure or toward providing a father where a single woman has chosen to bear a child. Public policy in these areas is best determined by the legislative branch of government, not the judicial. Our Legislature has already spoken and has afforded to unmarried women a statutory right to bear children by artificial insemination (as well as a right of men to donate semen) without fear of a

---

[9]A person with whom a child does not reside full time usually cannot be considered a de facto parent. De facto parent status is, however, legally possible under such circumstances. One court observed, "Although psychological parenthood is said to result from 'day-to-day attention to [the child's] needs for physical care, nourishment, comfort, affection, and stimulation' [citing Goldstein et al., Beyond the Best Interests of the Child (1973) p. 17)], appellants fail to point to any authority or body of professional opinion that equates daily attention with full-time residency. To the contrary, the record contains uncontradicted expert testimony that while psychological parenthood usually will require residency on a '24-hour basis,' it is not an absolute requirement; further, that the frequency and quality of . . . visits . . . provided an adequate foundation to establish the crucial parent-child relationship." (*Guardianship of Phillip B., supra,* 139 Cal.App.3d at pp. 420-421 [de facto parent status created where developmentally disabled child resided in institution but spent weekends at home of de facto parents and received regular weekday visits from them].) The court-appointed psychologist in the present case testified that Victoria had indeed become a psychological parent. The trial court rejected this testimony and made a contrary determination under the present facts. This determination, however, will not be binding in any subsequent litigation, since the facts inevitably will have changed (if for no other reason than the mere passage of time and its effect on the relationship between Victoria and Devin).

paternity claim, through provision of the semen to a licensed physician. We simply hold that because Mary omitted to invoke Civil Code section 7005, subdivision (b), by obtaining Jhordan's semen through a licensed physician, and because the parties by all other conduct preserved Jhordan's status as a member of Devin's family, the trial court properly declared Jhordan to be Devin's legal father.[10]

The judgment is affirmed.

Low, P. J., and Haning, J., concurred.

On April 25, 1986, the opinion was modified to read as printed above.

---

[10]Our decision is not influenced by the 1982 stipulated judgment of paternity in the county's reimbursement action. That judgment can have no collateral estoppel effect against Mary and Victoria. They were strangers to the reimbursement litigation (7 Witkin, Cal. Procedure (3d ed. 1985) Judgment, § 298, p. 737), and in fact Mary, whose child support rights in the reimbursement action were assigned to the state by operation of law, was precluded from appearing as a party for the purpose of impairing the county's right to reimbursement (*County of Alameda* v. *Sampson* (1980) 104 Cal.App.3d 584, 591 [163 Cal.Rptr. 915]; *In re Marriage of Shore* (1977) 71 Cal.App.3d 290 [139 Cal.Rptr. 349].) Additionally, Welfare and Institutions Code section 11350.1 specifically provides that the mother is not a necessary party to such an action. Finally, section 11350.1 expressly provides that a reimbursement judgment does not preclude relitigation of support issues in a subsequent UPA action. (*County of Los Angeles* v. *Superior Court* (1980) 102 Cal.App.3d 926, 929-930 [162 Cal.Rptr. 636].)

At first blush it would seem anomalous that a judgment of nonpaternity in the present case could follow a judgment of paternity in the reimbursement action. One judgment would impose a support obligation, while the other judgment would deny all of the rights and benefits of parenthood. Fortunately, the reimbursement statute prevents such legal mischief. Under the express provisions of the statute a conflicting determination in subsequent litigation on the issue of support supersedes the reimbursement judgment. (Welf. & Inst. Code, § 11350.1.) Thus, a judgment of nonpaternity in the present action—which would have implicitly established the absence of liability for support—would have superseded the paternity judgment in the reimbursement action and thereby extinguished Jhordan's support obligation.