Edward STRAUB, Appellant
(Respondent Below),

v.

B.M.T., by next friend, Francine TODD,
Appellee (Petitioner Below).

No. 10S04–9412–JV–1284.

Supreme Court of Indiana.

Dec. 30, 1994.

Rehearing Denied April 12, 1995.

S. Frank Mattox, Derrick H. Wilson, New Albany, J.R. Builta, Anderson, for appellant.

Earl C. Mullins, Jr., John T. Evans, Clarksville, for appellee.

## ON PETITION TO TRANSFER

SHEPARD, Chief Justice.

Francine Todd wanted to have a child, but she did not want to be married. She and Edward Straub signed an agreement providing that Edward Straub would not be responsible for supporting any child the two might procreate. B.M.T. was born in the wake of this agreement. When Straub offered this agreement as a defense to a claim for child support, the trial court held it void. When the validity of that agreement was before the Indiana Court of Appeals, it provoked a debate about the public policy surrounding a parent's child support obligation. We conclude that the agreement was void.

### I. Summary of Facts

The facts most favorable to the judgment reveal that in 1986 Francine Todd and Edward Straub engaged in a romantic relationship and sexual relations. In December of that year, Todd informed Straub of her desire to have a child. Straub was a divorcee with five children from a previous marriage, and he expressed resistance to fathering another child. Todd threatened to end the relationship, however, unless he agreed to impregnate her.

Straub handwrote the following statement and told Todd he would attempt to impregnate her if she signed it.

To whom it may concern

I Francine Todd in sound mind & fore thought have decided not to marry, but would like to have a baby of my own. To support financially & emotionally. I have approached several men who will not be held responsible financially or emotionally, who's [sic] names will be kept secret for life.

Signed Francine E. Todd

Dec. 15 1986

R. at 363. Todd signed the statement, and the couple thereafter began having unprotected intercourse. Todd became pregnant in March 1987 and gave birth that November.[1] The birth certificate did not list anyone as the father.

On January 7, 1991, Todd filed a petition asking the trial court to declare Straub the father of the child and require him to pay child support and certain medical expenses. Straub moved to dismiss on grounds that the statute of limitations had expired. Ind.Code Ann. § 31-6-6.1-6 (West Supp.1987). He later abandoned this defense and responded to Todd's petition on the merits. The trial court found Straub to be the father of the child and ordered him to pay support in the sum of $130 per week, arrearages of $20 per week and certain medical expenses.

Straub appealed this decision and the Court of Appeals affirmed. *Straub v. B.M.T. by Todd* (1993), Ind.App., 626 N.E.2d 848. He then petitioned this Court for transfer. Straub raises three issues, but the essence of all three may be stated as follows: whether a parent may contract away his or her rights and obligations to a child and/or the child's right to support through a preconception contract for fertilization. We grant transfer and affirm.

### II. Some Agreements Concerning Children Are Void

■ Three rudimentary elements must be present before an agreement may be considered a contract: offer, acceptance of the offer and consideration. *Rodman v. Rodman* (1878), 64 Ind. 65 (offer and acceptance required); *Berry v. Bates* (1828), 2 Blackf. 118 (promise without consideration is not legally binding). If these components are present, a legal obligation results from the bargaining of the parties as found in their language or by implication from other circumstances, as affected by the rules of law. *See, e.g.,* U.C.C. § 1-201(3).

■ There are instances, however, in which an agreement is not an enforceable contract despite proper formation. Where a properly formed agreement contravenes the public policy of Indiana, for instance, courts have traditionally said it is void and unen-

---

**1.** Straub and Todd continued their relationship, but Straub did not establish a relationship with the child.

forceable. *See Kahn v. Gumberts* (1857), 9 Ind. 430.[2] Leading commentators frame the principle somewhat differently, saying that in such circumstances there is no contract, because such an agreement produces no legal obligation upon the part of the promisor. *See, e.g.,* John D. Calamari & Joseph M. Perillo, *Contracts* § 1–11 (3d ed. 1987). It may well be more exact to say that where an agreement violates public policy, no contract is created.

In any event, certain agreements are prohibited outright by statute and thus void. *See, e.g.,* Ind.Code Ann. § 26–2–5–1 (West Supp.1994) (rendering void provisions which indemnify a promisee against liability for negligence by promisee or his or her independent contractors). There are even court rules outlawing certain agreements. *See, e.g.,* Ind.Professional Conduct Rule 1.5(d)(2) (no contingency fees in criminal cases).

■■■ More often, though, the question of whether an agreement is void on public policy grounds is a question of law to be determined from the surrounding circumstances of a given case. *Hodnick v. Fidelity Trust Co.* (1932), 96 Ind.App. 342, 183 N.E. 488. Where public policy is not explicit, we look to the overall implications of constitutional and statutory enactments, practices of officials and judicial decisions to disclose the public policy of this State. *Hogston v. Bell* (1916),

185 Ind. 536, 112 N.E. 883. Where there is not a clear manifestation of public policy we will find an agreement void only if it has a tendency to injure the public, is against the public good or is inconsistent with sound policy and good morals.[3] *Raymundo v. Hammond Clinic Ass'n* (1983), Ind., 449 N.E.2d 276, 279 (citing *Hodnick,* 96 Ind.App. at 350, 183 N.E. at 491).

■■■ One well-established public policy of this State is protecting the welfare of children. Expressed by all three branches of Indiana government, this policy is of the utmost importance.[4] In keeping with this public policy, Indiana courts have from time to time voided agreements reached by parents. Agreements which yield up a support opportunity for a child have been especially suspect. We have treated custodial parents who receive child support as trustees of the payments for the use and the benefit of the child. *Stonehill v. Stonehill* (1896), 146 Ind. 445, 447, 45 N.E. 600, 601 ("The person to whom money for support of a child is ordered paid by the court, receives it as a trustee, and can only expend the same for the benefit of the child."); *see also Lizak v. Schultz* (1986), Ind., 496 N.E.2d 40. Neither parent has the right to contract away these support benefits. The right to the support lies exclusively with the child. *See Ort v. Schage*

2. Federal judges occasionally take similar actions, using the Constitution. *See, e.g., Shelley v. Kraemer,* 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948) (private contract unenforceable because it discriminated based on race).

3. We also support the traditional precaution against the reckless use of public policy as a means for invalidating contracts. *Schornick v. Butler* (1933), 205 Ind. 304, 310–11, 185 N.E. 111, 113. This Court has embraced the notion that "the power of the courts to declare a contract void for being in contravention of sound public policy is a very delicate and undefined power...." *Hogston v. Bell* (1916), 185 Ind. 536, 544, 112 N.E. 883, 885.

4. The Indiana criminal code provides, among other things, that neglect and nonsupport of dependent children are class D felonies. Ind.Code §§ 35–46–1–4 and 5 (West 1986). *See also* Ind. Code Ann. § 31–6–6.1–11(a) (West Supp.1994) (court shall determine custody in accord with best interests of child); Ind.Code Ann. § 31–6–2–4 (West Supp.1994) (jurisdiction in juvenile cases determined, in part, based on best interests of

child); Ind.Code Ann. § 31–6–8–2(c)(1) (West 1979) (court considers best interests of child in expungement of juvenile records). *See also Lamb v. Wenning* (1992), Ind., 600 N.E.2d 96, 98 (custody determined according to best interests of child).

This Court evidenced the public policy of protecting the welfare of children by adopting the Indiana Child Support Guidelines ("Guidelines") on October 1, 1989. The purpose of the Guidelines is threefold: establishing as state policy an adequate standard of support for children; making awards more equitable by ensuring a more consistent treatment of people in similar circumstances; and improving the efficiency of courts by promoting settlements. Ind.Child Support Guideline 1.

The Indiana Family and Social Services Administration provides, finances, and coordinates a wide range of child support, child protection, health care, housing, and other social services for Indiana children and their families. *See* Ind. Code Title 12 (West 1994).

(1991), Ind.App., 580 N.E.2d 335, 336. Any agreement purporting to contract away these rights is directly contrary to this State's public policy of protecting the welfare of children, as it narrows the basis for support to one parent. *See* Child Supp.G. 1.

Seeking to avoid the rule that agreements between parents giving up a child's right to support are void, Straub contended during oral argument and in his appellate briefs that he was not a traditional parent but merely a sperm donor for Todd's "artificial insemination." The Indiana legislature has acknowledged the use of artificial insemination, though it has not addressed the support obligation of parents where artificial fertilization lead to the conception of the child.[5] *See* Ind.Code Ann. §§ 16–41–14–1–20 (West Supp.1994). Nonetheless, citizens of this State execute contracts for such fertilization.[6] These contracts have the ability to impact significantly the support responsibility of biological and nonbiological parents. Other jurisdictions have addressed the support issues surrounding artificial fertilization through the adoption of statutes based on the Uniform Parentage Act, 9B U.L.A. (1987) ("UPA"), and the Uniform Status of Children of Assisted Conception Act, 9B U.L.A. (Supp. 1993) ("USCACA"). The majority of states adopting legislation similar to these acts hold that the donor of semen or ova, provided to a licensed physician for use in the artificial fertilization of a woman, is treated under the law as if he or she were not the natural parent of the child thereby conceived.[7]. Otherwise, whether the impregnation occurs through artificial fertilization or intercourse, there *can* be a determination of parentage. *See, e.g., Jhordan v. Mary K.* (1986), 179 Cal.App.3d 386, 224 Cal.Rptr. 530.

Statutes based on either the UPA or the USCACA are excellent tools for ensuring that contracts for these services do not violate our public policy of protecting the welfare of children. Such contracts should reach the careful balance of enabling childless individuals to bear children while ensuring that the parental responsibilities normally born by the biological parents are assumed by another person or couple.

### III. Are Agreements Like This One Enforceable?

While Indiana does not have statutes on assisted conception, common law courts certainly have the ability to fashion and refashion the law of contract, as Judge Conover suggested in his dissenting opinion to the Court of Appeals. *Straub*, 626 N.E.2d at 854–55.[8] Accordingly, we evaluate the Todd agreement within the parameters of common law as influenced by the emerging contract principles surrounding reproductive technology.

---

5. The legislature has imposed limited record keeping and testing requirements for practitioners who receive, process, store or implant semen intended for donor insemination. Ind.Code Ann. § 16–41–14–1 to 20 (West Supp.1994). The legislature also recently enacted legislation addressing the enforceability of surrogate agreements. Ind.Code Ann. §§ 31–8–2–1 to 3 (West Supp. 1994).

6. We have noted other fields in which people manage to go about their way without government direction. *See, e.g., In re Lawrance* (1991), Ind., 579 N.E.2d 32.

7. A good number of states have adopted such legislation. *See* 4 Ga.Code Ann. §§ 19–7–21, 43–34–42 (Michie 1990 & Supp.1994); Or.Rev.Stat. §§ 109.239, 109.243, 109.247, 677.355, 677.360, 677.365, 677.370 (West Supp.1994); Wis.Stat. Ann. § 891.40 (West Supp.1994); N.J.Rev.Stat. § 9:17–44 (West Supp.1994); Minn.Stat.Ann. § 257.56 (West Supp.1994); Mo.Rev.Stat.

§ 210.824 (West Supp.1994); Mont.Code Ann. § 40–6–106 (West Supp.1994); Nev.Rev.Stat. Ann. § 126.061 (West Supp.1994); Cal.Fam. Code § 7613 (West Supp.1994); N.M.Stat.Ann. § 40–11–6 (West Supp.1994); Wash.Rev.Code Ann. § 26.26.050 (West Supp.1994); Ill.Ann.Stat. ch. 750, § 40/3 (West Supp.1994); Ala.Code. § 26–17–21 (1992); Colo.Rev.Stat.Ann. § 19–4–106 (Supp.1994); Wyo.Stat. § 14–2–103 (West Supp.1994).

8. Judge Conover explained:

Thus, in my opinion, the contract in question is valid and enforceable because it is conversant with current public policy. Todd had an absolute right to contract with Straub as she did, and is absolutely bound by the obligations she incurred under that contract. Quite simply, she bargained away the right to file a paternity action against Straub and to publicly name him as the child's father. *Straub*, 626 N.E.2d at 855–56 (Conover, J., dissenting).

This agreement fails on multiple accounts. First, it looks for all the world as a rather traditional attempt to forego this child's right to support from Straub, which contravenes public policy.[9] We conclude there is no such thing as "artificial insemination by intercourse" as Straub contends. The emerging law on contracts for artificial insemination so suggests. *See, e.g.,* USCA-CA § 1(1), 9B U.L.A. 138 (Supp.1993) ("assisted conception").

Second, consideration for this agreement, received by Straub, was sexual intercourse with Todd. Using sexual intercourse as consideration is itself against public policy. *Glasgo v. Glasgo* (1980), Ind.App., 410 N.E.2d 1325, 1331.

Third, the agreement contains none of the formalities and protections which the legislatures and courts of other jurisdictions have thought necessary to address when enabling childless individuals to bear children.[10] For these reasons, we hold the Todd agreement to be void and unenforceable.

We grant transfer and affirm the trial court.

GIVAN, DICKSON and SULLIVAN, JJ., concur.

DeBRULER, J., dissents with separate opinion.

DeBRULER, Justice, dissenting.

I agree with the majority that one cannot contract away the right of a child to financial support from one of her parents. One cannot contract away one's liability for negligence either, but we do permit people to buy insurance. If an individual's insurance coverage is inadequate then that person must pay. However, we do not void insurance contracts by invoking a public policy of imposing liability for negligence. The proper procedure to make certain that B.M.T. receives adequate support is that suggested by Judge Chezem's opinion in the Court of Appeals. *Straub v. B.M.T. b/n/f Todd* (1993), Ind.App., 626 N.E.2d 848, 854. If a person promises to pay the father's share of child support then, if that person is able, he or *she* should pay.

**9.** Whether characterized as an assumption of Straub's obligation to pay child support as Judge Chezem suggested in her concurring opinion or as an exculpatory agreement as Judge Conover suggested in his dissenting opinion, this agreement amounts to nothing more than paper-shuffling to achieve the same result: deprivation of support from both parents. *See Straub,* 626 N.E.2d at 854–55. Our opposition to the enforceability of this agreement is rudimentary. No matter how the agreement is portrayed, it is still violative of our public policy to protect the welfare of children through ensuring their financial security from both parents. Contrary to Judge Conover's suggestion, we reach this decision regardless of gender. Neither parent—male or female—may enter into such an agreement.

**10.** For example, prerequisites such as physician involvement are essential for protecting the health and welfare of the child conceived. *Jhordan,* 224 Cal.Rptr. at 534 (physician involvement essential to obtain donor's complete medical history which child may later need and creates a formal structure for donation which reduces misunderstandings of the relationship between donor and recipient and donor, recipient and child).