In re the Matter of PATERNITY
of M.F. and C.F.,

J.F., Appellant–Petitioner,

v.

W.M., Appellee–Respondent.

No. 21A04–1002–JP–84.

Court of Appeals of Indiana.

Dec. 27, 2010.

Gregory F. Zoeller, Attorney General of Indiana, Frances Barrow, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellant.

C. Jack Clarkson, Clarkson & Gulde, P.C., Rushville, IN, Sean Lemieux, Lemieux Law Offices, Bloomington, IN, Attorneys for Appellee.

## OPINION

FRIEDLANDER, Judge.

J.F. (Mother), on behalf of her minor children, M.F. and C.F., appeals the denial of a petition to establish paternity of M.F. and C.F. in W.M. (Father). Mother presents the following restated issues for review:

1. Did the trial court err in denying Mother's petition to establish paternity?

2. Did the trial court err in indicating it would consider awarding costs and attorney fees against the State?

We affirm in part, reverse in part, and remand.

The relevant facts are that in 1996, Mother was cohabiting and in a committed, long-term relationship with a woman we shall refer to henceforth as Life Partner. They wanted a child, so Mother and Father, who was a friend of Mother's, agreed that he would provide sperm with which to impregnate Mother. After a child (M.F.) was conceived but a few weeks before M.F. was born, the parties signed an agreement (the Donor Agreement) prepared by counsel for Mother in which the parties agreed that Father had donated sperm to Mother and a child was thereby conceived. The Donor Agreement contained the following provisions:

6. *Waiver and Release by Mother.* Mother hereby waives all rights to child support and financial assistance from Donor, including assistance with medical and hospital expenses incurred as a result of her pregnancy and delivery, and releases Donor from any and all claims of support for the child. It is expressly agreed that Mother will be solely responsible for the financial support of the child.

7. *Waiver and Release by Donor.* Donor hereby waives all rights to custody of or visitation with such child and releases Mother from any and all claims for visitation and covenants that he will not demand, request or compel any guardianship, custody or visitation rights with any such child. The parties expressly agree that Mother will act with sole

discretion as to all legal, financial, child-rearing and medical needs of such child without any involvement by or demands of authority from Donor, and Donor expressly agrees that Mother shall have sole physical and legal custody of such child and that Mother's custody of such child is in the child's best interest.

8. *Mutual Covenant Not to Sue.* Mother and Donor mutually agree to forever refrain from initiating, pressing, or in any way aiding or proceeding upon an action to establish legal paternity of the child due to be born on or about September 19, 1996.

*Appellant's Appendix* at 14. C.F. was born to mother seven years later, in 2003. Mother and Life Partner were still together at the time.

Mother and Life Partner's relationship ended sometime around 2008, when the children were approximately twelve and five years old, respectively. Mother filed for financial assistance in Fayette County. That ultimately led to the IV–D Prosecutor of Fayette County filing, on Mother's behalf, a Verified Petition for the Establishment of Paternity. The petition was filed on March 9, 2009. Father responded to the petition alleging multiple defenses, all which essentially cited the Donor Agreement as their basis.

DNA testing established that Father was indeed the biological father of both of Mother's children. A hearing was conducted on November 13, 2009. The discussion centered primarily on the validity of the contract. In a nutshell, at the hearing, Father stressed that the parties had a valid donor contract that precluded a paternity action against Father. Mother's argument at the hearing focused on her claim that the contract was invalid as against public policy. This argument, in turn, was based upon her contention that this contract runs afoul of the principle that the law will not enforce a contract that divests a child of support from either parent. Although it was arguably relevant to the issues before the trial court, the parties did not address the manner of the older child's conception.

Following the hearing, the trial court denied the petition to establish paternity as to both children on the aforementioned contract grounds. Essentially, the court held that the contract is valid and does not contravene sound public policy. Therefore, the court held that Mother was prohibited by contract from seeking to establish paternity in Father. Mother appeals that determination.

The trial court entered findings of fact and conclusions of law sua sponte. In such cases, we apply a two-tiered standard of review. We first determine whether the evidence supports the findings; next, we determine whether the findings support the judgment. *See Butler Univ. v. Estate of Verdak,* 815 N.E.2d 185 (Ind.Ct.App. 2004). Findings of fact and conclusions of law will be set aside only if they are clearly erroneous. *Id.* Findings and conclusions are clearly erroneous when the record contains no facts or inferences supporting them. *Id.* " 'A judgment is clearly erroneous when a review of the record leaves us with a firm conviction that a mistake has been made.' " *Id.* at 190 (quoting *Learman v. Auto–Owners Ins. Co.,* 769 N.E.2d 1171, 1174 (Ind.Ct.App.2002), *trans. denied* ). We consider only the evidence favorable to the judgment and all reasonable inferences drawn therefrom, and we will neither reweigh the evidence nor assess witness credibility. *Butler Univ. v. Estate of Verdak,* 815 N.E.2d 185. Findings entered sua sponte control only the issues they cover, and a general judgment standard of review controls issues upon which

there are no findings. *Id.* "A general judgment will be affirmed if it can be sustained on any legal theory supported by the evidence." *Id.* at 190–91.

██ A valid contract requires the following elements: An offer, an acceptance, consideration, and a manifestation of mutual assent. *Indiana Bureau of Motor Vehicles v. Ash, Inc.,* 895 N.E.2d 359 (Ind. Ct.App.2008). The parties concede that all of these elements are present here. We are confronted in this case, however, with a specific kind of contract, i.e., one between sperm donor and recipient regarding the conception of a child. Contracts of this nature present a different question with respect to contractual viability. Our Supreme Court discussed contracts of this particular variety at some length in *Straub v. B.M.T. by Todd,* 645 N.E.2d 597 (Ind. 1994). The Court noted that other jurisdictions that have addressed support issues arising from situations involving artificial fertilization have done so via the adoption of statutes based on the Uniform Parentage Act (UPA) and the Uniform Status of Children of Assisted Conception Act (USCACA). Citing *Jhordan v. Mary K.,* 179 Cal.App.3d 386, 224 Cal.Rptr. 530 (1986), the Court also noted, "[t]he majority of states adopting [similar] legislation ... hold that the donor of semen ... provided to a licensed physician for use in the artificial fertilization of a woman, is treated under the law as if he ... were not the natural parent of the child thereby conceived." *Straub v. B.M.T by Todd,* 645 N.E.2d at 600.

On the critical question of the enforceability of assisted conception contracts in Indiana, the Court evaluated the agreement in that case "within the parameters of common law as influenced by the emerging contract principles surrounding reproductive technology." *Id.* The Court held that the agreement failed on several counts, including: (1) insemination was achieved via intercourse ("there is no such thing as 'artificial insemination by intercourse'", *id.* at 601); (2) the agreement appeared "for all the world as a rather traditional attempt to forego this child's right to support from [the donor]", *id.*; and (3) the agreement contained "none of the formalities and protections which the legislatures and courts of other jurisdictions have thought necessary to address when enabling childless individuals to bear children." *Id.* Notably, however, the Court in *Straub* appears to have signaled that assisted conception contracts might be enforceable in Indiana in certain circumstances. Recalling the above reference to *Jhordan,* and noting the Supreme Court's description of the UPA and the USCACA as "excellent tools for ensuring that contracts for these services do not violate our public policy of protecting the welfare of children", we conclude that *Straub* may be fairly read as endorsing the view that such contracts may be valid if they comport with the requirements of those uniform acts. *Id.* at 600. What are those requirements?

In *Jhordan,* the California court set out the requirements of the California legislation, which was modeled after the UPA. The relevant statute provided that a "donor of semen provided to a licensed physician for use in artificial insemination of a woman other than the donor's wife is treated in law as if he were not the natural father of a child thereby conceived." Cal. Civ.Code § 7005(b) (West 1986). The court in that case determined that the agreement was not valid because the parties did not involve the services of a licensed physician, as provided in the statute. In discussing that issue, the court determined that the physician's involvement need not necessarily include the act of insemination itself, i.e., "Subdivision (b)

does not require that a physician independently obtain the semen and perform the insemination, but requires only that the semen be 'provided' to a physician." *Jhordan v. Mary K.*, 224 Cal.Rptr. at 535. This language is relevant to the principal point of contention of the parties in the instant case, i.e., the manner of conception.

With all of the procedural formalities of a contract met, both Mother and Father appear to concede that the viability of the Donor Agreement in the instant case depends upon the manner in which insemination occurred. Per *Straub*, if insemination occurred via intercourse, the Donor Agreement would be unenforceable as against public policy. Mother contends Father failed to prove that insemination did not occur in this manner. On the other hand, Father contends that Mother failed to prove that insemination did occur in a manner that would render the Donor Agreement void and unenforceable. Thus, an apparently complicated issue can be boiled down to simple legal question—who bore the burden of proof?

■ In this case, the parties entered into a facially valid contract whereby Mother agreed that she would not seek to establish paternity of M.F. in Father. Mother seeks to invalidate that Donor Agreement on the ground that the manner of insemination renders the Donor Agreement void as against public policy. As such, she seeks to avoid the contract. We conclude that this case is governed by the rule providing that a party that seeks to avoid a contract bears the burden of proof on matters of avoidance. *See General Housewares Corp. v. National Sur. Corp.*, 741 N.E.2d 408 (Ind.Ct.App.2000) (because the effect of the "known loss" doctrine is to avoid coverage under an insurance policy, the burden of proving that the loss was known is on the party seeking to avoid coverage); *Sutton v. Roth, Wehrly, Heiny,*

*Inc.*, 418 N.E.2d 229 (Ind.Ct.App.1981) (in a breach of contract action, the defendant has burden of proof on any matters of avoidance), *trans. denied*; *see also Carlson Wagonlit Travel, Inc. v. Moss*, 788 N.E.2d 501 (Ind.Ct.App.2003) *(a party raising the defense of agency in seeking to avoid contractual liability bears the burden of establishing the agency relationship)*. We understand the rationale undergirding our dissenting colleague's disagreement on this point. Without doubt, "there is a strong public policy in favor of parents supporting their biological children[.]" *Tirey v. Tirey*, 806 N.E.2d 360, 363 (Ind.Ct.App.2004), *trans. denied.* With this consideration as a starting point, the dissent believes the burden of proof should be allocated here to Father. Without in any way wishing to downplay the importance of this strong policy in favor of support, we cannot find any legal basis for assigning the burden in this manner. It seems to us that this is the sort of matter legislation on this subject would address. As of yet, however, our legislature has not seen fit to act and until it does, we must approach this situation utilizing traditional contract law principles. Our research reveals that the assignment of the burden is as we have described it—the party seeking to avoid a contract bears the burden of proving the means of avoidance. Thus, Mother bore the burden of proving that the manner of insemination rendered the Donor Agreement unenforceable.

■ We have reviewed all of the appellate materials and can find no indication of the manner in which Mother was inseminated with respect to the first pregnancy. The subject certainly was not addressed at the hearing. Therefore, Mother failed to prove that insemination incurred in such a way as to render the Donor Agreement unenforceable and void as against public policy. Because Mother failed to carry

her burden of proving that the contract was unenforceable on the stated basis, the trial court did not err in denying her petition to establish paternity with respect to M.F.[1]

We pause at this point to make several observations about another area of concern expressed by the dissent, i.e., the formalities of the contract itself. Specifically, we address our colleague's concern that our holding today might enable parties to easily escape the responsibility of supporting one's biological child. The concern is that this could be accomplished without much forethought and with minimal effort, perhaps by doing nothing more than concocting an informal, spur-of-the-moment written instrument whereby the biological mother and father agree that the father is absolved of any responsibility in connection with the child. Two aspects of our ruling prevent this possibility. First, as stated above, we hold today that a physician must be involved in the process of artificial insemination. At a minimum, this involvement includes the requirement that

the semen first be provided to the physician. This goes a long way toward preventing last-minute decisions to attempt the endeavor without the involvement of a medical professional. In fact, in our view, it obviates the possibility altogether.

Second, we do not mean to sanction the view that a writing consisting of a few lines scribbled on the back of a scrap of paper found lying about will suffice in this kind of case. To the contrary, the instrument in question must reflect the parties' careful consideration of the implications of such an agreement and a thorough understanding of its meaning and import. The Donor Agreement in the instant case easily meets these requirements and, to illustrate these principles in action, we offer the following brief summary of that document: First and foremost, we note that the Donor Agreement was prepared by an attorney. In fact, Paragraph 21 provides, "Donor specifically acknowledges that the Agreement was drafted by counsel retained by Mother, and that he has been provided full

---

1. In so holding, we note the contextual differences between our decision and the one made by the trial court in this case. The trial court determined that the parties were bound by the Donor Agreement unless Mother proved that instrument was not enforceable. It appears that the trial court focused its enforceability inquiry on the question of whether Indiana recognizes such contracts in the first place. The court concluded that Indiana *does* recognize donor contracts, and seems further to have concluded that, beyond the customary elements of a contract (i.e., offer, acceptance, legality of purpose, mutuality of obligation, consideration, competent parties) the sole criterion for validity of this kind of contract is that insemination may not occur via sexual intercourse. The court concluded that because Mother and Father agreed that there were no sexual relations between them (ergo, insemination did not occur via intercourse), the Donor Agreement was not against public policy and thus was valid. For our part, we affirmed the trial court's conclusion that donor agreements may be valid if they meet certain criteria beyond the traditional elements of a contract, although we have determined that the criteria are more extensive than just the manner of conception. To review, we conclude that a physician must be involved in the insemination and that the written instrument memorializing the arrangement must be sufficiently thorough and formalized.

In the final analysis, we affirm the trial court's conclusion that Mother bore the burden of proving that all of the applicable criteria have been satisfied. Although we cannot discern the basis for the trial court's finding that the "parties agree that, at no time, were there sexual relations between the mother and the [father]", *Appellant's Appendix* at 5, this does not change the fact that it was Mother's burden to prove the means of avoiding the contract, whether that involved the manner of conception, the lack of participation of a physician, the inadequacy of the Donor Agreement, or some other criterion. Having failed to do so, Mother is bound by the provisions of the Donor Agreement.

opportunity to review this Agreement with counsel of his own choosing before executing this Agreement." *Appellant's Appendix* at 17. The structure and sophistication of the document leaves little doubt about the veracity of this paragraph.

The Donor Agreement itself is a six-page, twenty-four-paragraph document that covers in detail matters such as acknowledgment of rights and obligations, waiver, mutual consent not to sue, a consent to adopt, a hold-harmless clause, mediation and arbitration,. penalties for failure to comply, amending the agreement, severability, a four-corners clause, and a choice-of-laws provision. We further discuss the substance of the Donor Agreement in even greater detail below. Interestingly, and further reflecting the careful deliberation that went into the drafting of the Donor Agreement in this case, it contains a clause entitled "Legal Construction", which provides,

> Each party acknowledges and understands that legal questions may be raised by the issues involved in this Agreement which have not been settled by statute or prior court decisions and that certain provisions of this Agreement may not be enforced by a court of law. Notwithstanding such knowledge, the parties choose to enter into this Agreement with the intent and desire that it be fully enforceable in all respects and to document their intent at the time the child was conceived.

*Id.* at 18.

In the final analysis, we are reluctant to set forth specific requirements with respect to such a contract's form and content, other than to reiterate that it must reflect careful consideration of the implications and a thorough understanding of the agreement's meaning and import. Consequently, we stop short of endorsing this particular contract as setting the minimum threshold with respect to form and content. We add, however, that in view of the lack of statutory law and the paucity of decisional law in this area, parties who execute a contract less formal and thorough than this one do so at their own peril. Although we have affirmed the trial court's order with respect to M.F., we address sua sponte an issue not separately presented by the parties, i.e., the correctness of the order denying the petition to establish paternity with respect to the second child, C.F. In its order, the trial court found: "Shortly before the birth of the first child, the mother and Respondent entered into a written agreement stating that the Respondent would not be responsible for the child *and any further children which might result from the Respondent's donated sperm.*" *Appellant's Appendix* at 5 (emphasis supplied). The highlighted language reflects the trial court's determination that the Donor Agreement applied to C.F. as well as M.F. We conclude this construction of the Donor Agreement is erroneous.

The Donor Agreement provided as follows:

2. Donor has provided his semen to Mother for the purpose of inseminating Mother, and as a result, Mother has become pregnant and is expected to give birth on or about September 19, 1996.

3. The parties are entering into this written Agreement in order to express their agreements, understanding, wishes and intention with regard to conceiving the child and their respective rights thereto.

*Id.* at 10. Throughout the remainder of the Donor Agreement, the product of insemination, i.e., the subject of the Donor Agreement, is referred to as either "the child" or "such child". *See, e.g., id.* at 13–16. Paragraph 8 provided that the parties

mutually agreed to refrain from initiating paternity proceedings with respect to "the child due to be born on or about September 19, 1996." *Id.* at 14. Paragraph 14 provided that the parties agreed to hold each other harmless "[i]n the event that the child due to be born on or about September 19, 1996" was miscarried or experienced certain medical difficulties. *Id.* at 15. Paragraph 17, entitled "Parties Bound", provided, "This agreement shall be binding upon and inure to the benefit of the parties and, with the exception of *the child that is the subject of this Agreement,* their respective heirs, trustees, administrators, representative, beneficiaries, agents, successors, and assigns." *Id.* at 16 (emphasis supplied). Finally, Paragraph 23, entitled "Legal Construction", provided that the parties understood the legal questions that might later arise were not yet settled matters of law, but nonetheless they chose "to enter into this Agreement with the intent and desire that it be fully enforceable in all respects and to document their intent *at the time the child was conceived.*'" *Id.* at 18 (emphasis supplied). In the face of these numerous manifestations of intent that the Donor Agreement applied to one child and one child only, i.e., M.F., we can find only two paragraphs containing language that might arguably be construed to refer to more than one child. Paragraph 4 provided, "It has always been the intention of Mother and Donor that any child born of Donor's insemination of Mother...." *Id.* at 13. We do not view the use of the phrase "any child" here as contemplating multiple children conceived by separate inseminations over time. Rather, it appears to be a generic reference encompassing whatever child or children was or were conceived as a result of the then-future insemination. We note in this regard that this provision refers to only one act of insemination. The second reference is similarly ambiguous and pertains to naming rights, i.e., "Each party acknowledges and agrees that the sole authority to name any child born pursuant to this Agreement shall rest with Mother." *Id.* at 14.

We conclude that two ambiguous references to "any child" fall well short of overcoming the clear meaning of language consistently and frequently utilized throughout the remainder of the Donor Agreement indicating that this contract applied specifically and only to the child due to be born on September 19, 1996, i.e., M.F. It cannot be construed to apply to future children conceived as a result of artificial insemination involving Mother and Father. Therefore, the trial court erred in holding that a valid, enforceable contract existed that would prohibit an action to establish paternity of C.F. in Father. In view of the fact that DNA testing established, and Father concedes, that he is the biological father of C.F., this cause is remanded with instructions to grant Mother's petition to establish paternity with respect to C.F.

2.

Mother contends the trial court improperly indicated it would consider awarding attorney fees and costs against the State. Father responds that, "even though he prevailed," he did not request the payment of attorney fees and therefore the question is moot. Generally, we will not disturb a lower court's determination where absolutely no change in the status quo will result. *Francies v. Francies,* 759 N.E.2d 1106 (Ind.Ct.App.2001), *trans. denied.* Although the trial court indicated it would "consider" awarding attorney fees, it did not do so. Moreover, we note that although Father invoked the Donor Agreement and prevailed on that basis as to M.F., he did not prevail in his argument that the Donor Agreement prevented paternity proceedings with respect to C.F.

Therefore, he is not entitled to attorney fees under Paragraph 16 of the Donor Agreement.

Judgment affirmed in part, reversed in part, and remanded with instructions.

BARNES, J., concurring.

CRONE, J., concurring in part and dissenting in part with separate opinion.

CRONE, Judge, concurring in part and dissenting in part.

I fully concur as to issue 2. Regarding issue 1, my colleague has done an excellent job of enunciating principles of contract law, but in my view the Donor Agreement is merely incidental to the paramount issue in this case: namely, Father's legal obligation to support his biological child, which is a cornerstone of Indiana family law. *See, e.g., Irvin v. Hood*, 712 N.E.2d 1012, 1014 (Ind.Ct.App.1999) ("Indiana law imposes upon a parent the duty to support his children. This duty exists apart from any court order or statute.") (citation omitted); *see also Straub*, 645 N.E.2d at 599 ("One well-established public policy of this State is protecting the welfare of children. Expressed by all three branches of Indiana government, this policy is of the utmost importance.") (footnote omitted). If this were strictly a contract case, I would agree with the majority that Mother, as the party seeking to invalidate the Donor Agreement, would have the burden of proving its invalidity. Because the core of this dispute falls squarely within the province of family law, however, and because our default position in Indiana is that a parent is legally obligated to support his biological child, I would hold that Father must bear the burden of proving that the terms of the Donor Agreement are consistent with public policy and/or that the Donor Agreement was performed consistent with public policy. In other words, as the party seeking to avoid his support obligation, Father should bear the burden of proving the validity of an exception to a well-established rule.

I agree with the majority that our supreme court in *Straub* "appears to have signaled that assisted conception contracts might be enforceable in Indiana in certain circumstances." Op. at 1259. I would hold that those circumstances must be extremely limited, in order to avoid creating a slippery slope whereby parents could evade their support obligations simply by signing an informal agreement hastily scribbled on a sheet of paper. At the very least, an assisted conception contract should provide that a donor's semen must be given to a licensed physician and that the artificial insemination must be performed by (or at least under the supervision of) the physician. Such a provision would both impress upon the parties the seriousness of their endeavor and safeguard the health of everyone involved. *See Straub*, 645 N.E.2d at 601 n. 10 ("[P]rerequisites such as physician involvement are essential for protecting the health and welfare of the child conceived."); *Jhordan*, 224 Cal.Rptr. at 534–35 ("[A] physician can obtain a complete medical history of the donor (which may be of crucial importance to the child during his or her lifetime) and screen the donor for any hereditary or communicable diseases.... Another justification for physician involvement is that the presence of a professional third party such as a physician can serve to create a formal, documented structure for the donor-recipient relationship, without which ... misunderstandings between the parties regarding the nature of their relationship and the donor's relationship to the child would be more likely to occur."). I believe that such prerequisites to finding a valid exception to the general obligation to support would

be consistent with *Straub* and a natural extension of its reasoning.

The Donor Agreement between Father and Mother does not contain such a provision, and Father has failed to establish that such a procedure was followed in this case with respect to M.F. I would remand with instructions to hold a hearing as to whether such a procedure was followed, and I agree with the majority that we should remand with instructions to grant Mother's petition to establish paternity with respect to C.F., in that the Donor Agreement "cannot be construed to apply to future children conceived as a result of artificial insemination involving Mother and Father." Op. at 1263.