Opinion
 

 LAMBDEN, J.
 

 The question of first impression posed by this appeal is: May a child conceived by artificial insemination by a donor sue the fertility clinic and doctors for failing to certify the signatures on the consent form pursuant to Family Code section 7613, subdivision (a)? (All further unspecified code sections refer to the Family Code.) Alexandria S. (Alexandria) appeals through Lorraine S. as her guardian ad litem from the judgment dismissing her claims for negligence and breach of contract against the Pacific Fertility Medical Center, Inc. (PFMC) and physicians Geoffrey Sher and Steven Dodge. (We use the singular PFMC to refer to all the defendants/respondents in this action.)
 

 We reject Alexandria’s novel claims.
 

 Background
 

 Lorraine S. (Lorraine) and Gordon S. (Gordon) married in June 1991. The couple had discussed having a child, although Gordon had a vasectomy prior
 
 *113
 
 to the marriage. After investigating the remote possibility of reversing the vasectomy, Lorraine and Gordon discussed having Lorraine undergo artificial insemination by a donor.
 

 In 1992, Lorraine and Gordon met with representatives of PFMC to discuss the insemination procedure. They both reviewed the donor catalogue and selected a man who resembled Gordon. PFMC provided the couple with a three-page consent form to execute.
 

 The first sentence on the form stated Lorraine and Gordon authorized PFMC “to inseminate Lorraine S[.] artificially.” The first page also contained the following: “We, and each of us, acknowledge our obligation to care for and support otherwise [sic] treat any child bom as a result of such artificial insemination in all respects as though it were our natural bom child.” The following paragraph appeared at the bottom of the second page: “We, and each of us, acknowledge our obligation to care for and support and educate and otherwise treat and consider any child bom as the result of such artificial insemination all respects [szc] as though it were our natural child. Neither of us shall ever allege in any proceeding that the child or children, is other than legitimate, and the male partner and the female partner acknowledge that the child shall be the lawful child of both the mother and male partner, and that neither of them shall assert a contrary position in any subsequent proceeding. . . .”
 

 The third page of the form contained the signatures of Lorraine, Gordon, and witness Phyllis C. Yolan. Above the signatures on the third page, the language referred to the signing parties as “Parents” at four separate places. The third page also contained a section for authorization by a notary public, but this section remained blank. No space existed on the form for a physician’s certification of Gordon’s and Lorraine’s consent to the procedure.
 

 In early 1992, Lorraine underwent the insemination procedure and became pregnant. Lorraine gave birth to Alexandria on December 26, 1992. Several months later, Gordon filed for divorce.
 

 On February 24, 1995, the Monterey County Superior Court (dissolution court) in In re Marriage of Gordon S[.] and Lorraine S[.] (Super. Ct. Monterey County, 1995, No. DR 27813) concluded Gordon had no legal duties or responsibilities towards Alexandria. The court found, in part: “Husband acknowledges that he was originally agreeable to having a child together, but this was while the parties were contemplating a normal married life. In actuality, their relationship was brief and stormy. They physically separated after about 5 days of marriage, resumed living together a few
 
 *114
 
 weeks later and finally separated a few days thereafter. [DO • • • [DO Husband knew his wife wished to have a baby even through
 
 [sic]
 
 they were planning to divorce. He had no objection to this. She told him that since they were still married, the Fertility Center required his authorization for any medical procedures. While at her home she presented him with a 1 page document that appeared to be a waiver of the right to bring legal action against the Fertility Center as a result of any difficulties arising out of the artificial insemination procedure. It was this limited one page document that he signed.
 

 “He agrees that he wished her well during her pregnancy and was happy for her that she realized her wish when a healthy child was bom. ... He adamantly denied ever consenting to be a father to the child or that any person or written document informed him that his merely acquiescing in her desire to have a child would have that effect. [DO The court finds that the greater force of the evidence supports husband’s version of what transpired. [DO Clearly, this was a marriage that had effectively, if not legally, ended long before the artificial insemination occurred. Petitioner did not wish to block Respondent’s strongly held desire to raise a child. Cooperation on his part to effectuate that result does not rise to the level of consent required by Family Code section 7613(a).
 

 “The safeguards written into Family Code Section 7613, and designed to insure unequivocal consent, were clearly not followed in this case. Documents were not properly witnessed and were essentially signed in blank. Had the precautions required by the law been carefully followed in this matter, the present protracted dispute would have been avoided. [DO The Court finds Petitioner is not legally obligated to support the minor child bom as a result of artificial insemination conducted at the Pacific Fertility Center.”
 

 Lorraine did not appeal the judgment denying child support; instead, on May 8, 1995, Lorraine and Alexandria filed a complaint alleging general negligence, negligence per se, and breach of statutory duty against PFMC. They filed in Monterey County Superior Court and the action was transferred to the Marin County Superior Court. PFMC filed a demurrer on May 16, 1995, which the court sustained with leave to amend.
 

 Only Alexandria filed a first amended complaint (with her mother appearing as guardian ad litem), and she alleged negligence, breach of statutory duty, and breach of contract. PFMC filed another demurrer and the court sustained it with leave to amend.
 

 On September 5, 1995, Alexandria filed her second amended complaint, alleging negligence and breach of contract. PFMC demurred and the court
 
 *115
 
 sustained it without leave to amend. On December 19, 1995, the judgment of dismissal was filed, and Alexandria filed a timely notice of appeal.
 

 Discussion
 

 I.
 
 Standard of Review
 

 After amending her complaint twice, the trial court sustained, without leave to amend, PFMC’s demurrer to Alexandria’s claims of negligence and breach of contract. When considering an appeal from a demurrer, we accept the facts pleaded as true.
 
 (American Philatelic Soc.
 
 v.
 
 Claibourne
 
 (1935) 3 Cal.2d 689, 699 [46 P.2d 135].) The trial court erred if the pleading states a cause of action under any possible legal theory; it abused its discretion if the face of the pleadings shows a reasonable probability the defects could be cured by a properly amended pleading.
 
 (Services by Medallion, Inc.
 
 v.
 
 Clorox Co.
 
 (1996) 44 Cal.App.4th 1807, 1812 [52 Cal.Rptr.2d 650];
 
 Gami
 
 v.
 
 Mullikin Medical Center
 
 (1993) 18 Cal.App.4th 870, 877 [22 Cal.Rptr.2d 819].) We find the trial court neither erred nor abused its discretion.
 

 II.
 
 Negligence
 

 Alexandria contends PFMC was negligent in failing to certify Gordon’s signature pursuant to section 7613, subdivision (a). Section 7613, subdivision (a) states: “If, under the supervision of a licensed physician and surgeon and with the consent of her husband, a wife is inseminated artificially with semen donated by a man not her husband, the husband is treated in law as if he were the natural father of a child thereby conceived. The husband’s consent must be in writing and signed by him and his wife. The physician and surgeon shall certify their signatures and the date of the insemination, and retain the husband’s consent as part of the medical record, where it shall be kept confidential and in a sealed file. However, the physician and surgeon’s failure to do so does not affect the father and child relationship. All papers and records pertaining to the insemination, whether part of the permanent record of a court or of a file held by the supervising physician and surgeon or elsewhere, are subject to inspection only upon an order of the court for good cause shown.” Since subdivision (b) of section 7613 ensures the donor of semen “provided to a licensed physician and surgeon for use in artificial insemination of a woman other than the donor’s wife” shall not be the legal father of the “child thereby conceived,” Alexandria was left with no legal father.
 

 Alexandria argues the intent of section 7613, subdivision (a) is to guarantee a record of consent and paternity to ensure, in accord with public policy,
 
 *116
 
 the child will have two parents financially responsible for the child. Alexandria contends the statute does not create a “mere ministerial responsibility.” Instead, she maintains the statute “has no use if it is not to protect a child from being left fatherless, and to ensure that there is a male parent responsible as the non-biological father when artificial insemination procedures are used to reach conception.” She asserts the state has an “ ‘interest in preserving and protecting the developed parent-child . . . relationships which give young children social and emotional strength and stability.’ [Citations.]” (Quoting
 
 Susan H.
 
 v.
 
 Jack S.
 
 (1994) 30 Cal.App.4th 1435, 1442 [37 Cal.Rptr.2d 120].)
 

 A duty of care may arise through statute, contract, the general character of the activity, or the relationship between the parties.
 
 (J’Aire Corp.
 
 v.
 
 Gregory
 
 (1979) 24 Cal.3d 799, 803 [157 Cal.Rptr. 407, 598 P.2d 60].) According to Alexandria, the statute created a duty to certify the signature; PFMC breached that duty; and the breach proximately and actually caused the dissolution court to find Gordon was not Alexandria’s legal parent. Although the procedure of artificial insemination by a donor (AID)
 
 [1]
 
 occurred prior to Alexandria’s conception, she contends the statute created a special relationship between PFMC and her because it was clearly foreseeable she would be harmed by PFMC’s failure to comply with the statute and the written consent was intended to benefit her (see
 
 Lucas
 
 v.
 
 Hamm
 
 (1961) 56 Cal.2d 583, 588 [15 Cal.Rptr. 821, 364 P.2d 685] [attorney owed duty of care to intended beneficiaries of client’s will]). She contends she suffered a direct injury from PFMC’s failure to obtain Gordon’s certified consent and relies upon
 
 Andalon
 
 v.
 
 Superior Court
 
 (1984) 162 Cal.App.3d 600 [208 Cal.Rptr. 899] and
 
 Newton
 
 v.
 
 Kaiser Foundation Hospitals
 
 (1986) 184 Cal.App.3d 386 [228 Cal.Rptr. 890]. In both
 
 Andalon
 
 and
 
 Newton,
 
 the courts found the father, who was not a patient of the physician, was a direct victim of the doctor’s negligence during the delivery of the baby.
 

 In determining whether a duty of care existed because of the special relationship between Alexandria and PFMC, we must consider the foreseeability of harm to Alexandria; the degree of certainty Alexandria suffered an injury; the closeness of the connection between PFMC’s conduct and Alexandria’s injury; the moral blame attached to PFMC’s behavior and the policy of preventing future harm; the burden to PFMC and the consequences to the community in imposing a duty; and the availability, cost, and prevalence of
 
 *117
 
 insurance for the risk involved. (See
 
 Nally
 
 v.
 
 Grace Community Church
 
 (1988) 47 Cal.3d 278, 292 [253 Cal.Rptr. 97, 763 P.2d 948].) “In the final analysis it is the court’s expression of the sum total of those conditions of policy which lead the law to say that a particular plaintiff is entitled to protection [citations].”
 
 (Keene
 
 v.
 
 Wiggins
 
 (1977) 69 Cal.App.3d 308, 313 [138 Cal.Rptr. 3].)
 

 We reject Alexandria’s claim of negligence because we find (1) public policy requires a finding of no cognizable injury, and (2) PFMC was not the proximate cause of any injury to Alexandria.
 

 A.
 
 Public Policy Mandates a Finding of No Cognizable Injury
 

 1.
 
 Development of law on AID
 

 A summary of the development of the law on AID—and the physician’s legal role in the procedure—is useful in an attempt to carve out the medical clinic’s and doctor’s potential liability for failing to comply with section 7613.
 

 The law on AID is relatively recent, but AID is not a new procedure. “ ‘The first recorded successful human artificial insemination was accomplished in England in 1770 . . . .’It was not accomplished in the United States until 1866 .... In the same year, an Italian scientist, Montegazza, found that human sperm could survive freezing and suggested that frozen sperm banks be used by widows whose husbands were killed at war.” (Mika & Hurst,
 
 One Way to Be Born? Legislative Inaction and the Posthumous Child
 
 (1996) 79 Marq. L.Rev. 993, 995, fns. omitted.) Initially, England, the United States, and Canada treated a married woman pregnant by AID as committing adultery. (Kinney,
 
 Legal Issues of the New Reproductive Technologies
 
 (1977) 52 Cal.St. Bar J. 514, 514-515; see, e.g.,
 
 Orford
 
 v.
 
 Orford
 
 (1921) 49 Ont.L.R. 15 [58 D.L.R. 251] [adultery defined as any act introducing a false strain of blood in the husband’s family];
 
 Gursky
 
 v.
 
 Gursky
 
 (1963) 39 Misc.2d 1083, 1088 [242 N.Y.S.2d 406, 411] [insemination by a donor is considered adultery even if husband consents to the procedure, but husband still had duty of support].)
 

 Although courts discontinued equating AID with adultery, they remained ambivalent regarding the legal status of the child conceived through AID. In 1968, our Supreme Court held the husband was the legal father of a child bom through AID and was liable for child support.
 
 (People
 
 v.
 
 Sorensen
 
 (1968) 68 Cal.2d 280 [66 Cal.Rptr. 7, 437 P.2d 495].) The court held: “[A] reasonable man who, because of his inability to procreate, actively participates and consents to his wife’s artificial insemination in the hope that a
 
 *118
 
 child will be produced whom they will treat as their own, knows that such behavior carries with it the legal responsibilities of fatherhood and criminal responsibility for nonsupport. ... [H ... [f] Therefore, since, the word, ‘father’ is construed to include a husband who, unable to accomplish his objective of creating a child by using his own semen, purchases semen from a donor and uses it to inseminate his wife to achieve his purpose, proof of paternity has been established beyond a reasonable doubt.”
 
 (Id.
 
 at pp. 285-286.)
 

 In 1964, Georgia enacted the first statute in the United States regulating the AID procedure (Ga. Code Ann. § 74-9904). (See Comment,
 
 Artificial Insemination and Surrogate Motherhood—A Nursery Full of Unresolved Questions
 
 (1981) 17 Willamette L.Rev. 912, 924.) This statute exempts the physician from liability to the husband, wife, and child bom through AID, as long as the physician obtains written consent and does not perform or administer the process negligently. The statute remains silent about any liability to the child bom through AID when the physician fails to obtain written consent.
 

 Shortly thereafter, in 1973, the National Conference of Commissioners on Uniform State Laws approved the Uniform Parentage Act (UPA). (9B West’s U.Laws Ann. (1987) Uniform Parentage Act, Historical Note, p. 287.) The purpose of the UPA was to provide “substantive legal equality for all children regardless of the marital status of their parents . . . .” (9B West’s U.Laws Ann.,
 
 supra,
 
 Uniform Parentage Act, prefatory note, at p. 289.) Additionally, it was designed to ascertain paternity and improve the “states’ systems of support enforcement.”
 
 (Ibid.)
 
 Section 5 of the UPA states the following: “(a) If, under the supervision of a licensed physician and with the consent of her husband, a wife is inseminated artificially with semen donated by a man not her husband, the husband is treated in law as if he were the natural father of a child thereby conceived. The husband’s consent must be in writing and signed by him and his wife. The physician shall certify their signatures and the date of the insemination, and file the husband’s consent with the [State Department of Health], where it shall be kept confidential and in a sealed file. However, the physician’s failure to do so does not affect the father and child relationship. All papers and records pertaining to the insemination, whether part of the permanent record of a court or of a file held by the supervising physician or elsewhere, are subject to inspection only upon an order of the court for good cause shown, [f] (b) The donor of semen provided to a licensed physician for use in artificial insemination of a married woman other than the donor’s wife is treated in law as if he were not the natural father of a child thereby conceived.” (9B West’s U.Laws Ann.,
 
 supra,
 
 Uniform Parentage Act, § 5, at p. 301.)
 

 
 *119
 
 The history of the UPA indicates a conscious decision to include the physician requirement, since the initial “discussion draft” submitted to the drafters of the UPA in 1971 did not mention physician involvement. (See
 
 Jhordan C.
 
 v.
 
 Mary K.
 
 (1986) 179 Cal.App.3d 386, 393 [224 Cal.Rptr. 530].) Two reasons have been posited for including the physician requirement: (1) health concerns—the doctor can obtain a complete medical history of the donor and screen donors for hereditary or communicable diseases; and (2) evidentiary concerns—the physician can serve to create a formal, documented structure.
 
 (Ibid.)
 

 The UPA does not address the physician’s liability for failure to screen donors with hereditary or communicable diseases; nor does it discuss the physician’s liability for failing to obtain a written consent. Indeed, in the comment to section 5 of the UPA, it states the following: “This Act does not deal with many complex and serious legal problems raised by the practice of artificial insemination. It was thought useful, however, to single out and cover in this Act at least one fact situation that occurs frequently. Further consideration of other legal aspects of artificial insemination has been urged on the National Conference of Commissioners on Uniform State Laws and is recommended to state legislators.” (9B West’s U.Laws Ann.,
 
 supra,
 
 Uniform Parentage Act, § 5, com. at p. 302.)
 

 In 1975, the UPA was introduced to California as Senate Bill No. 347 (1975-1976 Reg. Sess.). California did not heed the advice to consider other legal aspects of AID, and enacted former Civil Code section 7005, an essentially identical version of section 5 of the UPA. (Former Civil Code section 7005 became Family Code section 7613, with substantially no change, in 1993.) The legislation’s purpose was to “eliminate the legal distinction between legitimate and illegitimate children.”
 
 (Johnson
 
 v.
 
 Calvert
 
 (1993) 5 Cal.4th 84, 88 [19 Cal.Rptr.2d 494,. 851 P.2d 776].) As with the UPA, section 7613 does not address the physician’s liability; furthermore, a review of the legislative history of this statute does not illuminate the Legislature’s intent regarding the scope of the physician’s tort liability.
 

 Scholars have anticipated that the UPA’s skeletal formulation of AID would spawn numerous legal problems, and have frequently urged legislative clarification. (See, e.g., comment,
 
 The Need for Statutes Regulating Artificial Insemination by Donors
 
 (1985) 46 Ohio St. L.J. 1055; Note,
 
 Artificial Insemination and Surrogate Motherhood—A Nursery Full of Unresolved Questions, supra,
 
 17 Willamette L.Rev. 913.) Thus far, however, no state statute has grappled with these legal issues and there is a dearth of cases concerning the legal ramifications of the UPA.
 

 
 *120
 
 Our independent research has only uncovered one case discussing the doctor’s liability for failing to obtain consent—and that case involved liability to the husband, not the child conceived through AID. In
 
 Kerns
 
 v.
 
 Schmidt
 
 (1994) 94 Ohio App.3d 601 [641 N.E.2d 280], a husband sued the physician and his former wife for fraud for failing to obtain his consent to his wife’s undergoing AID. The Ohio court found the husband could not sue for fraud, but could possibly have sued for negligence. Ohio’s version of the UPA—like California’s version—does not provide for a civil remedy when the physician fails to comply with the statutory requirement of consent, but the Ohio court opined in dicta that the physician could still be liable for negligently interfering with the husband’s privacy interest and choice not to procreate.
 
 (Id.
 
 at pp. 610-611 [641 N.E.2d at pp. 285-286].)
 

 The court in
 
 Kerns
 
 v.
 
 Schmidt, supra,
 
 94 Ohio App.3d 601, admonished Ohio lawmakers to consider creating a civil remedy to address the situation when the doctor fails to obtain consent: “[B]y requiring a physician to obtain the husband’s consent prior to performing artificial insemination by a non-spousal donor, Ohio’s law anticipates the possibility that such consent might not be obtained, but neglects to acknowledge the potential harm flowing from, and the proper remedy for, the lack of consent. The concerns of the past regarding legitimacy of the offspring of those participating in non-spousal artificial insemination, and the purported rights of donors, having been resolved, it would now seem prudent for the General Assembly to consider questions surrounding nonspousal artificial insemination such as those posed by this appeal.” (94 Ohio App.3d 601, 610, fn. 3. [641 N.E.2d 280, 286].) The California Legislature could well heed the same advice urged upon Ohio’s General Assembly; it should consider what remedy a husband may have if he becomes the legal parent of a child conceived through AID, although he never consented to the procedure.
 

 The reasoning in the Ohio decision accords with the reasoning of the California court in
 
 Custodio
 
 v.
 
 Bauer
 
 (1967) 251 Cal.App.2d 303 [59 Cal.Rptr. 463, 27 A.L.R.3d 884]. In
 
 Custodio,
 
 the First District found the wife and husband had a cognizable claim for more than nominal damages when the woman became pregnant after a failed sterilization operation. The court thus found the physician had possibly interfered with the parents’ right to limit the number of children in their family.
 
 (Id.
 
 at p. 322.)
 

 These cases indicate the husband may very well have a claim against the doctor for interfering with his procreation rights (see
 
 Skinner
 
 v.
 
 Oklahoma
 
 (1942) 316 U.S. 535 [62 S.Ct. 1110, 86 L.Ed. 1655];
 
 Griswold
 
 v.
 
 Connecticut
 
 (1965) 381 U.S. 479 [85 S.Ct. 1678, 14 L.Ed.2d 510];
 
 Eisenstadt
 
 v.
 
 *121
 

 Baird
 
 (1972) 405 U.S. 438 [92 S.Ct. 1029, 31 L.Ed.2d 349];
 
 Carey
 
 v.
 
 Population Services International
 
 (1977) 431 U.S. 678 [97 S.Ct. 2010, 52 L.Ed.2d 675] [fundamental right to make procreative choices]), but this does not mean the child bom through AID has a cognizable claim. PFMC clearly did not deprive Alexandria of any procreation or privacy right.
 

 2.
 
 Alexandria’s claims
 

 In her pleadings, Alexandria alleges the physician’s act deprived her of a legal father. Furthermore, she alleges PFMC represented to Lorraine and Gordon that signing the consent form would make Gordon the legal father, and Lorraine “would not have undergone the artificial insemination procedure had she not believed that Mr. S[.] would share legal responsibility for the unborn Plaintiff, and now Ms. S[.] must take full legal responsibility for Plaintiff.” Thus, Alexandria premises her claim of negligence on essentially two theories: (1) PFMC deprived her of a legal father, and (2) PFMC’s negligent misrepresentation resulted in her being bom.
 

 a.
 
 No legal parent
 

 The aftermath of recognizing a tort for deprivation of a legal parent has the potential of expanding tort law to permit children to sue physicians, single parents, lesbian and gay parents, or sexual partners of their parent for causing them to have only one or no legal parent. The possible social consequence from such a tort was addressed in an Illinois decision, faced with a similar question. In
 
 Zepeda
 
 v.
 
 Zepeda
 
 (1963) 41 Ill.App.2d 240 [190 N.E.2d 849], the court found the defendant’s promise to marry the mother induced her to have sexual intercourse with him. The mother was unaware the defendant was already married. The child resulting from this sexual encounter sued the biological father claiming he was deprived of his right to have a normal home and was stigmatized as a bastard. The court rejected the claim and deplored the pernicious social consequences resulting from the recognition of such a tort: “One might seek damages for being bom of a certain color, another because of race; one for being bom with a hereditary disease, another for inheriting unfortunate family characteristics; one for being bom into a large and destitute family, another because a parent has an unsavory reputation.”
 
 {Id.
 
 at p. 260 [190 N.E.2d at p. 858].)
 

 Similarly, in
 
 Williams
 
 v.
 
 State
 
 (1966) 18 N.Y.2d 481 [276 N.Y.S.2d 885, 223 N.E.2d 343], a New York court refused to permit a child to sue for negligence, although the child was bom as a result of the mother’s rape while a patient at a state hospital. The child claimed she was forced to bear the stigma of “illegitimacy” and to suffer the deprivations of normal childhood and familial property rights. The court found policy and social reasons
 
 *122
 
 prohibited the recognition of such a tort.
 
 (Id.
 
 at p. 484 [223 N.E.2d at p. 344].)
 

 Courts have also refused to recognize such a tort, because it presumes a child without two legal parents suffers an injury from such an occurrence. “Illegitimacy is a status which may or may not prove to be a hindrance to one so bom, depending on a multitude of other facts; it cannot be disputed that in present society such a circumstance, both socially and legally, no longer need present an overwhelming obstacle. The same is true for the simply unwanted child. ... [A] cause of action based upon impairment of status—illegitimacy contrasted with legitimacy—should not be recognizable at law
 
 because
 
 a necessary element for the establishment of any cause of action in tort is missing,
 
 injury
 
 and damages consequential to that injury.”
 
 (Curlender
 
 v.
 
 Bio-Science Laboratories
 
 (1980) 106 Cal.App.3d 811, 825 [165 Cal.Rptr. 477].)
 

 Thus, we join the other courts in refusing to permit a child to sue for being deprived of a legal parent.
 

 b.
 
 Wrongful life
 

 We have an additional reason for finding Alexandria cannot claim a cognizable injury. Despite Alexandria’s attempts to argue vigorously to the contrary, her claim resembles a wrongful life claim by a healthy child. Wrongful life claims are actions brought on behalf of children
 
 (Turpin
 
 v.
 
 Sortini
 
 (1982) 31 Cal.3d 220, 225, fn. 4 [182 Cal.Rptr. 337, 643 P.2d 954]), while wrongful birth claims refer to actions brought by parents
 
 (ibid.).
 
 California courts do recognize a wrongful life claim by an “impaired” child for special damages (but not for general damages), when the physician’s negligence is the proximate cause of the child’s need for extraordinary medical care and training. (See
 
 Turpin
 
 v.
 
 Sortini, supra,
 
 31 Cal.3d at p. 230.) No court, however, has expanded tort liability to include wrongful life claims by children bom without any mental or physical impairment. (See, e.g.,
 
 Stills
 
 v.
 
 Gratton
 
 (1976) 55 Cal.App.3d 698, 705 [127 Cal.Rptr. 652] [when the only damage is in being bom, “ ‘[t]he legal implications of such a tort are vast,’ ” and the social impact could be “ ‘staggering’ ”];
 
 Foy
 
 v.
 
 Greenblott
 
 (1983) 141 Cal.App.3d 1, 14 [190 Cal.Rptr. 84] [child bom to a patient in a mental facility could not sue the facility and physicians for wrongful life when he was bom physically healthy].) Courts have disallowed such actions based on a finding of no legally cognizable injury or no rationally ascertainable damages.
 
 (Turpin
 
 v.
 
 Sortini, supra,
 
 31 Cal.3d at p. 230.)
 

 
 *123
 
 Alexandria characterizes her claim as being for child support rather than for wrongful life; but whether she phrases her claim as denying her (1) a legal parent, (2) child support, or (3) any other attribute uniquely related to the parent/child relationship, the claim is akin to a wrongful life claim by a healthy child. Furthermore, Alexandria alleged in her pleading if her mother had known Gordon would not provide financial support, her mother would not have undergone AID. This allegation is indistinct from a wrongful life claim.
 

 Alexandria cannot amend her complaint to cure this defect. If she asserts Lorraine would have undergone AID even if Gordon refused to consent, PFMC’s failure to obtain his consent could not have caused any injury. Thus, we find Alexandria has no cognizable claim because she is essentially requesting this court to recognize a wrongful life claim by a child bom without any impairment.
 

 B.
 
 PFMC Was Not the Proximate Cause of any Injury to Alexandria
 

 Even if we were willing to broaden tort liability to permit children bom through AID to sue the physician for failing to obtain consent, we would deny Alexandria’s claim because PFMC was not the proximate cause of any injury to her. Alexandria contends she obviously suffered an injury and cites the dissolution court’s finding she was not entitled to child support because the documents were not certified as required by section 7613, subdivision (a). If, however, certification is not required to establish consent under the statute, PFMC’s failure to certify cannot be the source of Alexandria’s problem.
 

 PFMC argues its failure to certify the signatures did not proximately cause Alexandria’s damages. Physicians do not certify a husband actually consents to accept legal paternity; instead, they certify the authenticity of the signature. No one contests Gordon signed the form. Thus, even if PFMC had certified the signature, he still would have contested his understanding of the legal ramifications of his consent.
 

 Additionally, PFMC argues, the statute specifies “the physician and surgeon’s failure to [certify the signature] does not affect the father and child relationship. . . .” (§ 7613, subd. (a).) The statute’s intention, according to PFMC, was to have a third party medical provider retain the consent forms in the event future disputes arise. PFMC contends, “If the Legislature had intended a private right of action to accme for failure to certify, that right
 
 *124
 
 would have been expressly included in the statute and should not be judicially created.”
 
 [2]
 

 In response, Alexandria claims the statute does not relieve PFMC from liability. Rather, she asserts, the exemption language is to ensure nonbiological fathers can assert their rights as the legal father even when the clinic does not comply with the statute. She claims the public policy of the State of California favors protecting the rights of children and parents, not limiting them. (See
 
 In re Marriage of Ryan
 
 (1994) 22 Cal.App.4th 841, 848 [27 Cal.Rptr.2d 580];
 
 Estate of Hafner
 
 (1986) 184 Cal.App.3d 1371, 1389 [229 Cal.Rptr. 676].) Basing a finding of legal paternity on a third party’s proper completion of the certification process, however, would be inconsistent with the state’s interest in protecting the rights of children.
 

 To determine whether certification was necessary to establish consent, we' begin by comparing the wording of section 7613 with the UPA. Section 7613 is almost identical to section 5 of the UPA and both require the physician to obtain written consent from the husband and wife (when the woman is married) and to certify their signatures. Section 7613 does differ from section 5 of the UPA in the respect the former pertains to all women while the latter applies only to “married women.” Additionally, section 7613 was amended to substitute physician and surgeon for the word physician.
 

 Written consent by the husband was always deemed necessary to establish legal paternity, but the requirement of certification was not included in the first “discussion draft” submitted to the drafters of the UPA. (See Krause, Illegitimacy: Law and Social Policy (1971) § 5, p. 243.) The “discussion draft” did require two witnesses to the husband’s written consent, and it proposed the following: “(a) If the husband has consented to artificial insemination of his wife, a resulting child is the legitimate child of the husband and wife. The husband’s consent shall be in writing, acknowledged by two witnesses, and filed with the [registrar of births] where it shall be kept in a sealed file. . . .”
 
 (Ibid.)
 

 When discussing proof of legal paternity under section 5 of the UPA, scholars have focused on written consent, not the certification process. At least one legal scholar interpreting section 5 of the UPA has concluded legal paternity is established with written consent. (See, e.g., Note,
 
 Developing a Concept of the Modern “Family”: A Proposed Uniform Surrogate Parenthood
 
 
 *125
 

 Act
 
 (1985) 73 Geo. L.J. 1283, 1293, fn. omitted [“As long as the wife receives AID through a licensed physician and the husband has consented to the procedure, the husband is treated by law as the child’s natural father.”].) This scholar also concludes other acts required by the UPA, such as failing “to file the proper documentationf,] [do] not affect the child’s status.”
 
 (Id.
 
 at p. 1293.)
 

 Neither the California Legislature nor any court has directly confronted the issue of what constitutes substantial compliance with the statute; more specifically, whether obtaining written consent without certification satisfies the statute. Moreover, a legislative history of section 7613 provides little guidance. A court in New Mexico, however, did find oral consent substantially complied with New Mexico’s version of the UPA.
 
 [3]
 

 (Lane
 
 v.
 
 Lane
 
 (1996) 121 N.M. 414 [912 P.2d 290].) The New Mexico court in
 
 Lane
 
 v.
 
 Lane
 
 explained: “As for the requirement that the consent be in writing, we have searched in vain for commentary on the Uniform Act that addresses the matter. . . . Nevertheless, it appears clear to us that the requirement of a writing serves two functions. First, the writing serves an evidentiary function. The existence of a document signed by the husband and the wife avoids disputes regarding whether consent was actually given. Second, the requirement serves a cautionary purpose. One who pauses to sign a document can be expected to give more thought to the consequences of consent than one who gives consent in a less formal setting. An additional purpose that may be served by the requirement of written consent is to protect from liability the medical personnel who conduct the procedure, but failure to advance that purpose could hardly be a ground for denying the husband’s status as a natural parent.”
 
 [4]
 

 (Id.
 
 at p. 419 [912 P.2d at p. 295].)
 

 The New Mexico court seems to have completely disregarded the certification process when determining substantial compliance. It implicitly treated certification as a ministerial act.
 

 
 *126
 
 Nothing in the language of section 7613 or in its legislative history suggests a failure to certify should defeat the objective of the statute—which is to establish two legal parents. In fact, the statute specifically states the failure to certify “does not affect the father and child relationship” (§ 7613, subd. (a)). Certification may be relevant when a party claims the signature is not authentic; otherwise, certification is immaterial to the issue of consent under the statute. Accordingly, we hold the husband’s written consent is sufficient to establish legal paternity under section 7613, subdivision (a); thus, failing to certify the signature could not be the proximate cause of Alexandria’s loss of child support.
 

 This interpretation of section 7613, subdivision (a), protects the child from suffering the very injury claimed by Alexandria—being left without a parent. As we believe the dissolution court erred in finding Gordon did not consent within the meaning of the statute, we do not believe the law created a problem in need of a remedy. Alexandria’s proper remedy, which she unfortunately neglected to pursue, was to appeal the erroneous ruling of the dissolution court.
 

 III.
 
 Breach of Contract
 

 Alexandria alleges Lorraine entered into an oral agreement with PFMC in the early part of 1992 and PFMC promised to prepare evidence of Gordon’s paternity in the form of a duly and properly certified consent. She claims she was an intended third party beneficiary of the agreement because she was to receive all rights and benefits ensuing from her being the legal child of Gordon. PFMC, she contends, breached the agreement by failing to prepare, certify, and maintain the proper consent forms, as Lorraine fulfilled her end of the bargain by paying for all services.
 

 Even assuming PFMC made such an oral promise, Alexandria suffered no damages. As explained fully above, Gordon is the legal parent of Alexandria under section 7613, subdivision (a). Accordingly, we find the court did not abuse its discretion in sustaining the demurrer without leave to amend the breach of contract claim.
 

 IV.
 
 Challenging the Dissolution
 
 Order
 
 *
 

 
 *127
 
 Conclusion
 

 We find Alexandria has no cognizable claim against PFMC and children conceived through AID cannot sue the medical center or physicians providing the service for failing to obtain the husband’s written consent. Furthermore, PFMC did obtain written consent from Gordon and its failure to certify the signature did not invalidate Gordon’s written consent. Thus, Alexandria suffered no damages in either tort or breach of contract.
 

 Accordingly, we affirm the judgment dismissing the second amended complaint and award PFMC costs.
 

 Kline, P. J., and Ruvolo, J., concurred.
 

 Appellant’s petition for review by the Supreme Court was denied July 30, 1997.
 

 [1]
 

 We use the term artificial insemination by a donor since that is the wording of the statute. The proper terminology is heterologous (therapeutic donor) insemination. (See, e.g., Wadlington,
 
 Artificial Insemination: The Danger of a Poorly Kept Secret
 
 (1970) 64 Nw. U. L.Rev.
 
 777,
 
 781, fn. 15.)
 

 [2]
 

 We disagree with PFMC’s argument to the extent it asserts it has no liability because the statute does not include a remedy for failing to comply with its requirements. As explained
 
 ante
 
 in part II.A.l, the physician and clinic may be liable to a husband if they fail to gamer his written consent. The Legislature is urged to consider the issues raised by this appeal.
 

 [3]
 

 The New Mexico statute provides: “If, under the supervision of a licensed physician and with the consent of her husband, a woman is inseminated artificially with semen donated by a man not her husband, the husband is treated as if he were the natural father of the child thereby conceived so long as the husband’s consent is in writing, signed by him and his wife. The physician shall certify their signatures and the date of the insemination and file the husband’s consent with the vital statistics bureau of the health services division. . . .” (N.M. Stat. Ann. § 40-11-6.)
 

 [4]
 

 Even if oral consent would not be considered substantial compliance under section 7613, subdivision (a) (see
 
 Jhordan C.
 
 v.
 
 Mary K.,
 
 supra, 179 Cal.App.3d 386 [protections of statute do not apply when mother did not involve the services of the physician in the AID procedure as required by the statute]), oral consent to the AID procedure would be sufficient to establish legal responsibility for child support under common law pursuant to
 
 People
 
 v.
 
 Sorensen, supra,
 
 68 Cal.2d 280, 285-286.
 

 *
 

 See footnote,
 
 ante,
 
 page 110.